**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SYSTEM DEVELOPMENT INTEGRATION, LLC, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>COMPUTER SCIENCES CORPORATION, )<br>)<br>Defendant. ) | No. 09-CV-4008 |

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

Before the Court is Defendant Computer Sciences Corporation's ("CSC") Motion for Summary Judgment on Counts I through IV of Plaintiff System Development Integration, L.L.C.'s ("SDI") Complaint and Motion for Summary Judgment on Count V of SDI's Amended Complaint. For the following reasons, the Court grants both of CSC's motions for summary judgment.

## BACKGROUND

### I.     Northern District of Illinois Local Rule 56.1

When determining summary judgment motions, the Court derives the background facts from the parties' Local Rule 56.1 statements. Specifically, Local Rule 56.1 assists the Court by "organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side propose[s] to prove a disputed fact with admissible evidence." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000). Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue." *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). "The opposing party is required to file 'a response to each numbered paragraph in the moving party's

statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon.'" *Id.* (citing N.D. Ill. R. 56.1(b)(3)(B)). In addition, Local Rule 56.1(b)(3)(C) requires the nonmoving party to present a separate statement of additional facts that require the denial of summary judgment. *See Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643-44 (7th Cir. 2008). Pursuant to the Local Rules, the Court will not consider any additional facts proposed in the nonmoving party's Local Rule 56.1(b)(3)(B) Response, but instead must rely on the nonmovant's Local Rule 56.1(b)(3)(C) Statement of Additional Facts when making factual determinations. *See id.* at 643; *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809 (7th Cir. 2005) ("Local Rule 56.1 requires specifically that a litigant seeking to oppose a motion for summary judgment file a response that contains a separate 'statement … of any additional facts that require the denial of summary judgment.'") (emphasis in original).

Moreover, the purpose of Rule 56.1 statements is to identify the relevant evidence supporting the material facts, not to make factual or legal arguments, *see Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006), and thus the Court will not address the parties' arguments made in their Rule 56.1 statements and responses. Also, the requirements for responses under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon*, 233 F.3d at 528. Further, the Court may disregard statements and responses that do not properly cite to the record. *See Cichon*, 401 F.3d at 809-10. Finally, "hearsay is inadmissible in summary judgment proceedings to the same extent that it is

inadmissible in a trial." *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). With these standards in mind, the Court turns to the relevant facts of the case.[1]

## II.     Objections to Gupta Declaration

With respect to both motions for summary judgment, CSC has also filed its Objections to the Declaration of David Gupta, President of SDI. CSC argues that the declarations submitted by Gupta in support of SDI's opposition to the motions for summary judgment are self-serving and conclusory and that they improperly cite to deposition testimony and documentary evidence. In addition, CSC levels tailored objections to the majority of assertions contained in the Gupta affidavits arguing that the assertions are based on hearsay, misstate the facts of the case, contradict the declarant's deposition testimony, and state legal conclusions. SDI requests the Court to therefore disregard these specifically identified portions of the Gupta declarations.

Rule 56(e)(1) of the Federal Rules of Civil Procedure sets forth requirements for affidavits submitted at the summary judgment stage:

> A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit. The court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits.

Fed.R.Civ.P. 56(e)(1). "While personal knowledge may include inferences and opinions, those inferences must be substantiated by specific facts." *Vakharia v. Little Co. of Mary Hosp. & Health Care Ctrs.*, 62 Fed. Appx. 122, 125 (7th Cir. 2003); *Drake v. 3M*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general

---

[1]  To the extent that the parties statement of facts with respect CSC's Motion for Summary Judgment on Counts I-IV of SDI's Complaint and CSC's Motion for Summary Judgment on Count V of SDI's Complaint contain duplicative facts, the Court has cited to the parties initial statement of facts.

truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.")

The Court has reviewed Gupta's affidavits. Gupta's affidavits are rife with unsupported claims and assertions and, in many instances, the declarations provide no context to demonstrate that Gupta has personal knowledge of the facts to which he avers. Gupta, for example, asserts in his declaration that he has reviewed "portions" of the Exelon RFP and attaches portions of the Exelon RFP to his declaration. (R. 87, Ex. 1, ¶¶ 3-4.) Gupta, however, makes conclusory assertions regarding provisions of the RFP that are not included in the exhibit to his affidavit without averring that he has reviewed those portions of the document. It is thus unclear whether Gupta has any basis for these unsubstantiated claims. In addition, Gupta makes many assertions regarding representations by CSC employees, and others, that are unsupported by evidence. Statements in affidavits premised on hearsay and not personal knowledge cannot be used to defeat a motion for summary judgment. *Martin v. Shawano-Gresham Sch. Dist.,* 295 F.3d 701, 713 (7th Cir. 2002). In addition, in his affidavits, Gupta improperly asserts many legal conclusions, including legal conclusions that go to the heart of SDI's claims. This is also improper. *See* Fed. R. Civ. P. 56(e).

For all of these reasons, in instances in which Gupta's affidavits do not comply with Rule 56(e)(1) or Seventh Circuit law, the Court will not deem the relevant fact admitted. Given the breadth of the improper assertions contained in his affidavits, the Court will not belabor a paragraph by paragraph analysis of the declarations. The assertions disregarded by the Court, however, include: (i) descriptions of the RFP not supported by the documentary evidence, (ii) the conclusory assertion that "at all times SDI was and is a qualified and certified minority

owned business," (iii) the statement that, in December 2007, "SDI and CSC reached an agreement that involved an exclusive partnership," (iv) assertions regarding the specific terms of the partnership agreement, (v) representations of unidentified CSC employees and representations regarding unspecified oral agreements (no dates, no parties, no terms), (vi) factual assertions lacking foundation, (vii) the conclusory assertion that documentary evidence "confirms" the terms of the partnership between SDI and CSC, (viii) representations of CSC to third parties, (ix) assertions regarding the meaning of documents prepared by CSC, and (x) conclusory assertions regarding contract terms and the legal effect of documents unsupported by the documentary evidence.

Finally, the Court notes that while the deficiencies in Gupta's affidavits require admission of many of the facts proffered by CSC, "the court did not turn a blind eye to the facts elsewhere available, though it is permitted to do so by non-compliance with the local rule." *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995). Though while the Court need "not scour the record . . . to make [SDI's] arguments," *Jackson v. Xerox Corp.*, 349 F. Supp. 2d 1119, 1123 (N.D. Ill. 2004), SDI has cured some of the deficiencies in Gupta's affidavits by presenting evidence in its statement of additional facts which is supported by proper evidentiary citations.[2]

For the foregoing reasons, the Court sustains CSC's objections to the Gupta declarations and will not consider the objectionable portions of the declarations for purposes of resolving the motions for summary judgment. With these considerations in mind, the Court turns to the relevant facts.

---

[2] While many of the statements contained in SDI's statement of additional facts contain improper legal conclusions, *see Cady*, 467 F.3d at 1060, the Court will consider will consider properly supported factual assertions contained in those paragraphs.

### III.    Relevant Facts

#### A.    Background

SDI is a Delaware limited liability company with its principal place of business in Chicago, Illinois.  (R. 62-1, Def.'s L.R. 56.1 Statement of Facts, ¶ 2.)  CSC is a Nevada corporation with its principal place of business in Falls Church, Virginia.  *Id.*

#### B.    The Exelon Request for Proposal

In November 2007, Exelon Business Services Company, LLC ("Exelon"), a Chicago-based energy company, issued a Request for Proposal for the Exelon IT Infrastructure and Managed Voice Services and Outsourcing Agreement ("RFP").  (R. 62-1, ¶ 7; R. 86-1, ¶ 1.)  The RFP involved an opportunity to provide information technology ("IT") consulting services to Exelon.  (R. 86-1, ¶ 1.)  According to an Exelon representative, one of the specific instructions in the RFP was that, at a minimum, Exelon would award at least 15% of the contract to a minority or women-owned business enterprise ("MWBE") either directly or through a subcontractor.  (R. 87, Ex. 5, 22:2-7.)  A discussion draft of the RFP also indicated that Exelon intended to award 10-15% of the "scope of services" to a MWBE.  (R. 95, Tab 29, EX 127.)  The RFP contained a Pennsylvania choice-of-law provision.  (R. 86-1, ¶ 4.)  Exelon sent the RFP to five bidders, including CSC.  (R. 62-1, ¶ 7.)

#### C.    CSC and SDI Subcontract Negotiations

While it is unclear whether SDI or CSC first approached the other party regarding the Exelon RFP, on December 13, 2006, CSC informed SDI that it wanted to partner with SDI for its proposal to Exelon.  (R. 87, Ex. 9.)  At the time Exelon issued the RFP, SDI represented that it was a MWBE and that it had a significant business relationship with Exelon.  (R. 64-1, ¶ 11.)  As

of the date of his deposition, Gupta testified that SDI was not a minority certified firm. (R. 69, Tab 3, 20:1-21:13.)

During negotiations between the parties, CSC recommended SDI as a minority business subcontractor to Exelon to meet the RFP obligation of providing 15% of the total contract value to minority business providers. (R. 87, Ex. 2, 250:15-21.) Joan Burns, Business Development Executive at CSC, testified that SDI and CSC agreed to partner together to obtain the Exelon business in the Fall of 2007. (R. 87, Ex. 8, 51:24-53:3.) Burns also stated that "CSC and SDI agreed that SDI would be the exclusive minority business partner with respect to the Exelon business and that SDI would perform desktop services in connection with the Exelon project." *Id.* She also noted that "CSC agreed that SDI would be paid for its work on the Exelon project as a percentage of the total contract value" and that the Exelon Contract required CSC to provide 15% of the total contract value to a minority-owned business enterprise. *Id.*

Gupta testified that, in December 2007, SDI and CSC began negotiating the financials of the agreement and that SDI agreed to exclusively partner with CSC in exchange for CSC giving SDI 15% of the total contract value associated with the desktop and desk side services under the Exelon RFP.[3] (R. 69, Tab 3, 103:10-24.) Indeed, in response to a December 5, 2007 email in which SDI stated that "[w]e have a decision to make which would impact another NDA," CSC stated to SDI: "We want to partner with SDI. Nancy Stewart WILL be sending you the NDA today for sure! We look forward to working with you." (R. 87, Ex. 7; R. 100, ¶ 3.) Similarly, in a December 13, 2007 email to SDI, CSC wrote that it "decided to partner exclusively with SDI

---

[3] SDI repeatedly asserts, without evidentiary support, that the RFP required CSC to "pay" the MWBE "at least 15% of the total charges in connection with the Exelon business." (R. 100-1, ¶ 2.) Instead, the cited evidence demonstrates that the RFP contemplated that the contractor (CSC) must award 15% of the contract to a MWBE. *Id.* There is no mention or discussion of payment to the MWBE. *Id.*

for our proposal to Exelon.  We have signed off on the other part.  I have asked Nancy Stewart to get the teaming agreement to you asap . . . .  Please communicate our thanks to everyone on your team for yesterday and our excitement about the partnership."  (R. 69, Tab 19; R. 87, Ex. 9.)  The December 13, 2007 email contains a disclaimer that:  "Regardless of content, the e-mail shall not operate to bind CSC to any order or other contract unless pursuant to explicit written agreement or government initiative expressly permitting the use of e-mail for such purpose."  *Id.*  In addition, the email does not detail any rights, obligations or financial responsibilities of the parties.  *Id.*

After these initial discussions between CSC and SDI, on January 4, 2008, CSC submitted a response to the RFP to Exelon.  (R. 69, Tab 1, 95:14-21.)[4]  In the response, CSC stated to Exelon that: "We are pleased to include SDI as our preferred MWBE partner."  (R. 87, Ex. 11, SDI080904.)  CSC's response also stated that CSC agreed to the Pennsylvania choice-of-law provision contained in the Exelon RFP.[5]  (*Id.* at SDI081115.)  SDI did not participate in providing information to Exelon regarding pricing for the help desk services requested in the Exelon RFP.  (R. 69, Tab 7, 52:5-11.)

On or about February 13, 2008, CSC made an oral presentation to Exelon about its response to the RFP.  Gupta also attended that oral presentation.  (R. 69, Tab 3, 55:1-56:21.)[6]  During the presentation, CSC conveyed to Exelon that it had a "single MWBE partnering

---

[4] SDI asserts that the parties jointly submitted the response to the RFP to Exelon (R. 86-1, ¶ 9), but the cited evidence does not support this proposition.  The Court may disregard statements and responses that do not properly cite to the record.  *See Cichon*, 401 F.3d at 809-10.

[5] SDI asserts that both CSC and SDI accepted the Pennsylvania choice-of-law provision contained in the Exelon RFP, but the cited evidence does not support this statement.  The Court may disregard statements and responses that do not properly cite to the record.  *See Cichon*, 401 F.3d at 809-10.

[6] SDI asserts that SDI jointly made the presentation in response to the RFP with CSC, but cites no evidence, including Gupta's declaration, to support this contention.  (R. 86-1, ¶ 10.)  The Court may disregard statements and responses that do not properly cite to the record.  *See Cichon*, 401 F.3d at 809-10.

relationship with SDI." (R. 87, Ex. 12, SDI001472.) CSC also conveyed that one of its competitive advantages was that SDI's resources would provide field support to satisfy the MWBE requirements and that SDI was its desktop services partner.[7] (*Id.* at SDI001476, SDI001509.) Exelon did not interview any personnel at SDI, and SDI did not make any presentation to Exelon after the February 13, 2008 presentation and before the contract award. *Id.*

Also in February 2008, Exelon expressed concern to CSC about CSC's selection of SDI based on the "newness of the relationship." Exelon asked CSC to explain the steps it would take to ensure that CSC could fully integrate SDI into its service delivery model for Exelon. In response, CSC stated that:

> CSC has asked our subcontractors to be "true" partners and have the willingness and commitment not only to share in the rewards, but assume the risks that may be associated with this type of project. SDI has the financial capacity to carry these risks. Additionally, SDI has the ability to provide these services across all Exelon locations. They would be the SPOC [single point of contact] for CSC and we would not be required to contract with multiple MWBE players. This allows for strong business continuity between our organizations. SDI has agreed to flow-downs from the contract between Exelon and CSC.

(R. 87, Ex. 13, EX00000012.)

Throughout April 2008, CSC and SDI continued to communicate regarding the Exelon business. CSC repeatedly stressed the importance of the CSC-SDI relationship to Exelon and requested SDI to assist CSC in garnering the Exelon business. In an April 3, 2008 email from Burns to Gupta, for example, Burns wrote that it was important for SDI to communicate the strength of CSC's solution as well as SDI's collaborative involvement to Exelon. (R. 87, Ex. 18.) In an April 4, 2008 email from Burns to SDI, during an email chain in which the parties

---

[7] SDI again asserts that during the presentation CSC represented that it would pay SDI for its services by satisfying the 15% MWBE requirement, but the cited evidence does not reference payment to SDI.

negotiated contract terms, Burns stated that "CSC has agreed to 15%." (R. 87, Ex. 14.) In an April 18, 2008 email to Gupta, Burns requested that Gupta, on behalf of SDI, specifically ask for the Exelon business when communicating with Exelon. (R. 87, Ex. 15.) Thereafter, on April 16, 2008, Gupta spoke with John Rowe, an Exelon executive. After this discussion, Gupta conveyed to Burns that he informed Rowe of the benefits of the CSC/SDI collaboration. (R. 87, Ex. 15.)

On June 1, 2008, Exelon and CSC signed a contract entitled Outsourced Services Agreement with respect to the Exelon IT business effective June 1, 2008 (the "Exelon Contract"). (R. 69, Tab 1, 30:3-7, Pls.' Ex. 77; R. 86-1, ¶ 18.) CSC admits that CSC and SDI obtained the Exelon business together. (R. 86-1, ¶ 17.) In a June 4, 2008 email from CSC to SDI, CSC thanked SDI for its assistance during the "Exelon pursuit" and stated "[w]ith CSC and SDI partnered, we conveyed a message and a solution . . . This is the start of a wonderful relationship between CSC and SDI. Welcome to our team!" (R. 86-1, ¶ 17.)

The Exelon Contract was for a five-year term, with the possibility of three one-year extensions. (R. 64-1, ¶ 14.) CSC, not SDI, was the prime contractor and ultimately had responsibility for subcontractors. (R. 94, ¶ 11.) SDI was not a party to the Exelon Contract and did not sign the Exelon Contract.[8] (Pls. Ex. 77; R. 101, Ex. 21.) Indeed, Gupta testified that he had never seen the Exelon Contract. (R. 69, Tab 3, 74:8-10; Tab 11 at ¶ 17.) The Exelon Contract only identified services to be performed by CSC and did not identify any services to be performed by SDI. (Pls. Ex. 77; R. 101, Ex. 21.) The only explicit reference to SDI in the Exelon Contract is that the Exelon Contract listed SDI on a schedule as an approved

---

[8] SDI denies that it was not a party to the Exelon Contract by citing ¶¶ 24-25 Gupta's affidavit in which Gupta asserts that the Exelon Contract is consistent with the terms of SDI and CSC's partnership agreement and that the Exelon Contract identifies SDI as CSC's minority business partner. (R. 87, Ex. 1, ¶¶ 24-25.) While SDI is listed as an approved subcontractor to the Exelon Contract, SDI is not a signatory to the contract nor does the Exelon Contract make any reference to the particular services that SDI would provide as a subcontractor. (Pls. Ex. 77.)

subcontractor for "Desktop Support." *Id.* " Desktop Support" services are defined as "Level 2 Support" which in turn means "support and assistance provided by support organizations . . . in connection with the resolution of Problems, including Deskside support." *Id.* During their negotiations, Exelon and CSC agreed to rates for desktop services based on the RFP process. (R. 87, Ex. 5, pp. 1115-119.) An Exelon representative testified that those rates were competitive market rates. *Id.*[9]

The Exelon Contract also contained a provision providing that CSC agreed to use "Diversity Suppliers: to perform Services generating at least 15% of the total charges under the [Exelon Contract] each year." *Id.* The Exelon Contract does not require that one single MWBE perform services or that the MWBE must provide specific services under the contract. *Id.* In addition, the Exelon Contract did not dictate the amount or method of payment to a MWBE supplier. *Id.* The Exelon Contract also provided that, to the extent that subcontractors provide support to CSC, CSC "shall cause such [subcontractors] to comply with the obligations and restrictions applicable to [CSC] under [the Exelon Contract]." (R. 87, Ex. 19, EX000000350.) Pursuant to the contract, Exelon had the right to enforce the minority business requirement. (R. 86-1, ¶ 3.) The "cutover" or "go-live" date, the date when CSC would become responsible for providing services to Exelon under the Exelon Contract, was November 1, 2008. (R. 64-1, ¶ 15.) Like the RFP, the Exelon Contract also contained a Pennsylvania choice-of-law provision. (R. 86-1, ¶ 19.) Overall, the Exelon Contract was valued at approximately $20 million per year. (R. 87, Ex. 5, 93-98.)

---

[9] SDI asserts that Exelon and CSC agreed to the market rates that CSC would pay for the services provided by SDI, but there is no mention of SDI in the evidence cited in support of this assertion. In addition, SDI repeatedly asserts that CSC represented that it would pay SDI "the 15% minority business payments," but each of these assertions is unsupported by the evidence. (R. 100, ¶¶ 9, 11.)

SDI and CSC discussed a subcontract between them that would be for period of five years with the possibility of three one-year extensions. (R. 64-1, ¶ 16.) With respect to a contract provision permitting Exelon to solicit SDI employees at the end of the Exelon Contract, SDI agreed to the condition based on the assumption that SDI would fulfill no less than 15% of the Exelon Contract. (R. 101, Ex. 20.) The proposed subcontract also contained a provision indicating that "SDI shall provide Level 2 Support (including Deskside Support.)" (R. 101, Ex. 30.) The sticking term during negotiations between CSC and SDI was pricing. Pursuant to the subcontract agreement, CSC would pay SDI as a subcontractor. (R. 94-1, ¶ 14.) According to Gupta, SDI and CSC began discussing the financial aspect of the subcontract agreement "more in depth" in August 2008, after Exelon and CSC signed the Exelon Contract. (R. 69, Tab 3, 103.) Just prior to that, in a July 1, 2008 email to SDI providing a latest version of the "contract overview," CSC attached a series of pricing tables that summarized the charges for deskside support services. (R. 87, Ex. 22.)[10] For the desktop services in the Exelon Contract, CSC charged and Exelon paid based on "per device pricing." (R. 87, Ex. 2, 225.) CSC, however, discussed paying SDI not on "per device pricing," but instead based on "per event pricing." *Id.* Laurie Nupnau, CSC Account Executive for Exelon, testified that she did not know why the method for pricing in the Exelon Contract was for "per device pricing" and the pricing CSC proposed to SDI was "per event pricing." (R. 87, Ex. 2, 248.)[11]

---

[10] SDI contends that CSC provided the rates that Exelon agreed to pay for desktop services to SDI, but the cited evidence does not support this assertion. Indeed, while Gupta makes assertions regarding this document, he never avers that he received it and he does not appear as a recipient on the email which contained the document. (R. 87, Ex. 22.)

[11] SDI again makes a series of conclusory assertions regarding the pricing of the Exelon Contract and the pricing between SDI and CSC that are without evidentiary support. (R. 86-1, ¶¶ 25-26.) For example, SDI contends that CSC for the first time informed SDI that it would pay it based on "per event pricing" after obtaining the Exelon Contract, but none of the evidence cited reflects the date of this occurrence. In his declaration, Gupta asserts that: "Shortly after CSC signed the Exelon Contract, CSC for the first time sent rate cards to SDI that proposed to pay SDI a fee related to each service call." SDI, however, does not identify the alleged mailings or dates associated with

On August 30, 2008, Gupta emailed Burns and indicated that "the next obstacle is the budget. Somehow the CSC team feels there is now only room for SDI to have $2.1M max per year to cover desktop for Exelon. . . . SDI will not be provided the 15% target of the overall revenue for the project." (R. 87, Ex. 24.) In response, Burns indicated that she agreed that the parties needed to devote time and energy to completing the subcontract between CSC and SDI. *Id.* With regard to pricing, she stated that "our pricing reflects exactly the model and template we were required to complete from Exelon during the bid process." *Id.* Gupta responded that he felt that SDI was "getting less than half of what was budgeted for our specific activities," and CSC noted that it should explain to Gupta what "the other 'half' of the work that we are not giving them is." *Id.*

On September 10, 2008, CSC emailed SDI a "fully executable" proposed subcontract for desktop services and requested SDI to sign the agreement and deliver it to CSC by the following day. (R. 69, Tab 17.) Pursuant to the pricing schedules in this "best and final offer," CSC proposed to pay SDI approximately $3.1 million per year for desktop services. (R. 86-1, ¶ 30.) In response, SDI emailed CSC and explained why it believed that SDI was entitled to additional compensation for the subcontract work. *Id.* SDI wrote, "we feel good about the opportunity and we are ready to sign today with the exception of the economics." (R. 69, Tab 17.) The economics were a key term of the subcontract agreement that SDI and CSC had negotiated for months. (R. 64-1, ¶ 19.) After receiving SDI's response, CSC informed SDI that it considered SDI's response a rejection of the subcontract. *Id.* Neither CSC nor SDI signed the September 10, 2008 subcontract proposed by CSC. *Id.* at ¶ 20.

this purported disclosure, or identify any supporting documentary evidence.

On September 12, 2008, CSC notified Exelon that CSC and SDI had failed to reach an agreement and that CSC was moving forward with plans to use another subcontractor. (R. 64-1, ¶ 21.) On September 14, 2010, Exelon wrote to CSC and stated: "It s [sic] incredibly disappointing that this change has occurred this late in the process. SDI was specified as part of your bid to us. It s [sic] your sub and your call, but this should have been addressed long ago. It is my expectation that this will not have an impact on the November 1 go-live, but it is certainly a concern and on my radar." (R. 69, Tab 25.) In an internal SDI email on September 16, 2008, Burns stated that "part of Exelon's evaluation of CSC's proposal and award was the total package and evaluation of [SDI]." (R. 101, Ex. 23.) Also on September 16, 2008, David Gupta began to send emails to Exelon executives complaining about SDI's negotiations with CSC and asked that Exelon not allow CSC to replace SDI with another subcontractor. (R. 64-1, ¶ 22.) In response, Exelon informed Gupta that it could not dictate CSC's subcontractor, and that it could only require CSC to meet its MWBE requirement. (R. 95, Tab 31.)

Despite this hurdle in the subcontract negotiations, during this same time period, CSC and SDI continued to discuss a potential subcontract agreement. Approximately one week after September 13, 2008, CSC informed SDI that it wanted to continue discussions regarding the subcontract and the parties instituted further negotiations. (R. 69, Tab 3, 148:1-20.) As part of these further negotiations, on September 22, 2008, CSC sent a rate card to SDI evidencing rates totaling $1.9 million per year. *Id.* at 153:12-15. In contrast, the rate card that CSC had sent SDI previously, on September 10, 2008, was for $3.1 million per year. *Id.* Gupta testified that the $1.9 million figure "would have been completely inadequate to support the work." *Id.* at 154:16-155:3.

On September 23, 2008, James Doyle, CSC's Vice President, who had authorization to finalize a subcontract with SDI, reached an oral agreement with SDI. Pursuant to the oral agreement, CSC would provide the best and final rates from September 10, 2008 on a "per event basis" to SDI, and SDI would provide the services set forth in the best and final offer from September 10, 2008. (R. 87, Ex. 23, 183, 238-39.) On September 24, 2008, as part of that agreement, Burns sent Gupta an unsigned signature page to the subcontract and requested SDI to sign and return the page. (R. 87, Ex. 33.) On September 24, 2005, SDI sent CSC a subcontract signed by SDI. (R. 64-1, ¶ 23; R. 87, Ex. 34.) In the email to CSC, Linda Petty, SDI's General Counsel, attached is a copy of the subcontract agreement signed by Gupta on behalf of SDI and stated: "Please note that I changed the header on the [subcontract] to show 'execution copy' on all pages. I also provided SDI's full name at the signature block at the end of the [subcontract]. Also attached are the Glossary and all Exhibits. Please note that Exhibit C-3 is the last agreed upon version, rather than the one sent by Shelly in the zip file on September 10th." (R. 87, Ex. 34.) Critically, Gupta did not include the rate cards to the subcontract when he returned the signature page to CSC. (R. 69, Tab 14, ¶ 5.) The subcontract agreement SDI signed contains a Pennsylvania choice of law provision. (*Id.* at SDI001634.) Section 21.5(a) of the subcontract agreement also provides that the parties and their affiliates will not solicit or attempt to hire any employees of the other party. (*Id.* at SDO001641.)

After SDI returned the signed subcontract, numerous internal emails reflected that various employees at CSC believed that CSC and SDI had reached an agreement. On September 24, 2008, Burns responded to SDI and stated: "On behalf of my team I want to thank you for the time, energy and effort to reach an agreement and executed contract. Now, let's get back to

focusing on the client and delivering incredible services with a seamless transition and-go live of November 1." (R. 87, Ex. 35.) Also in a September 24, 2008 internal CSC email, Nupnau, stated that "[t]he SDI agreement did come through today." (R. 87, Ex. 36.) On September 25, 2008, another internal CSC email stated, "SDI and CSC signed the contract." (*Id.*) Also on September 25, 2008, a CSC employee emailed SDI to congratulate it on the executed contract. (*Id.*) CSC, however, never signed the subcontract. (R. 94-1, ¶ 16.)

CSC soon realized a disconnect between the parties' oral agreement and SDI's perception of that agreement. Doyle testified that after signing the subcontract, Gupta sent back a different rate card than what CSC and SDI had discussed as part of their oral agreement. (R. 87, Ex. 23, 240; R. 69, Tab 12, ¶ 4.) Nupnau also testified that while SDI returned a signed signature page for the subcontract agreement, SDI did not include the rate cards on which CSC had signed off. (R. 69, Tab 14, ¶ 5.) Nupnau explained that after CSC requested the rate cards from SDI, CSC learned that SDI had exchanged the rate cards for something other than CSC's most recent proposal. *Id.* On September 25, 2008, Doyle accordingly sent SDI an email that attached Exhibits C-1, C-2, and C-3 to the subcontract which reflected payment to SDI of approximately $1.9 million per year. (R. 86-1, ¶ 37; R. 87, Ex. 40.) Later that day, Doyle again sent an email to Gupta attaching the Exhibit C schedules. (R. 69, Tab 12.) In response, Gupta stated, "I signed off on the deal you sent me on Sept 11th in good faith. Now you are rescinding." *Id.* Also on September 25, 2008, Gupta requested that CSC return the signature pages that SDI had signed "until this is resolved." (R. 69, Tab 12.) Gupta testified that he made this request because he was concerned that CSC "was going to continue to play games, to swap out rate cards that were already agreed and signed to." (R. 69, Tab 3, 81:14-82:8.)

In an September 30, 2008 internal Exelon email, Patrick White represented that: "[CSC] mentioned that the terms had actually been agreed to orally, but when it came time to sign the [subcontract], David Gupta sent over a document (specifically a pricing sheet) that was not consistent with what CSC believed had been agreed on." (R. 87, Ex. 41.) CSC never agreed to accept the different rate cards that Gupta sent to CSC. (R. 69, Tab 12, ¶ 5.) SDI never performed any desktop services for Exelon pursuant to the its purported subcontract agreement with CSC. (R. 95, Tab 7, 90.)

### D.    CSC and CC-OPS Subcontract Negotiations

During the subcontract negotiations between CSC and SDI, CSC was also negotiating with a second subcontractor. Specifically, when it became clear to CSC that it might not be able to reach agreement with SDI, Cavicchia negotiated a subcontract agreement with Computer Consulting Operations Specialists, Inc. ("CC-OPS"). (R. 69, Tab 11, ¶ 18.) Napnau testified that as of September 15, 2008, after SDI rejected the initial subcontract offer, she moved forward with CC-OPS because CSC had to "send standup services for our client [Exelon]." (R. 95, Tab 8, 422.) She asked Cavicchia if SDI had accepted the proposed final contract and when Cavicchia responded no, Napnau moved on to deliver the service to Exelon via CC-OPS. (R. 95, Tab 8, 412-13.) Cavicchia also testified that if CSC did not provide services for Exelon by November 1, 2010, it would be in breach of the Exelon Contract. (R. 69, Tab 11, ¶ 19.) CSC and CC-OPS finalized the statement of work between CSC and CC-OPS before September 19, 2008. (R. 87, Ex. 2, 450.) David Hoisch, CC-OPS's 30(b)(6) deponent, testified that he believed that CC-OPS received an award letter from CSC in late August 2008. (R. 87, Ex. 37, 51.) CC-OPS signed the subcontract agreement with CSC on September 18, 2008, and CSC

signed the agreement on October 7, 2008.  (R. 69, Tab 11, ¶ 18.)  Before CSC signed the

agreement, on September 20, 2008, CC-OPS wrote to CSC and provided a quote of $2,395,000

for October 1, 2008 – September 30, 2009.  (R. 87, Ex. 38.)  CC-OPS did not have an

expectation that it would receive 15% of the total contract value of the Exelon project.  (R. 87,

Ex. 37, 126.)  Schedule F to the Exelon Contract was ultimately amended to include CC-OPS as

a subcontractor and Exelon approved CC-OPS as a subcontractor.  (R. 94-1, ¶ 12.)

Also in September 2008, CSC discussed internally whether they would undertake efforts

to move candidates to whom SDI had made offers of employment to CC-OPS.  (R. 87, Ex. 39.)

In an email to Nupnau, a CSC employee stated, "we may want to talk to legal counsel about any

representations from getting this far along with SDI, and then not coming to terms  . . .  followed

by our wanting or needing to take on staff they have just hired."  (R. 87, Ex. 39.)

E.     **SDI's Employment Offers to IT Specialists and Preparation for Exelon
Contract**

Robert Kettell, an SDI employee, testified that in preparation for the November 1, 2008

"go live" date of the Exelon Contract, SDI identified around 29 individuals, prepared those

individuals to come to SDI, and hired those individuals.  (R. 87, Ex. 17, 40-41.)   Also to prepare

for that date, Kettell explained that SDI had to learn how Exelon handled issues from a desktop

point of view and how CSC performed their functions.  *Id.*  To do so, SDI employees visited

locations in and around Chicago as well as in the Philadelphia area.  *Id.*  These preparations

involved several SDI employees devoting themselves full-time to the preparation as well as part-

time assistance from other employees.  *Id.*

Heidi Peltz, an SDI employee, testified that SDI made offers to somewhere between 20-

29 individuals to service the Exelon contract.  (R. 87, Ex. 16, 13-16.)  SDI, however, rescinded

its offers, both orally and in writing, to all of the IT specialists it hired to perform computer desktop services at Exelon. (R. 64-1, ¶ 26.) SDI told the employees that "if we don't have a contract with CSC for provision of service at Exelon, that their employment would not be required by us." (R. 69, Tab 3, 175:10-22.) Ultimately, SDI only paid one IT specialist for one week of work performed, and did not provide any form of compensation to the remaining IT employees. (R. 64-1, ¶ 26.)

### F. SDI's Use of CSC Office Space

Prior to the start date of the Exelon Contract, SDI offered CSC the use of office space in its Chicago office. (R. 69, Tab 3, 179:12-181:16.) Beyond payment pursuant to the Exelon Contract, SDI did not expect separate compensation for use of the office space. *Id.* Diver testified that he was unaware of any discussions between CSC and SDI regarding payment for use of the office space. (R. 69, Tab 2, 51:3-7.) SDI never invoiced CSC for the use of SDI's office space or any other service. (R. 64-1, ¶ 43.)

### G. Exelon's Relationship with SDI

At the time Exelon issued the RFP, SDI represented to CSC that it was a MWBE and that it had a significant business relationship with Exelon. (R. 64-1, ¶ 11.) Gupta, however, only identified one specific business venture between ComEd, a subsidiary of Exelon, and SDI that occurred in the late 1990s. (R. 69, tab 3, 34:13-35-19.) Specifically, Gupta testified that the nature of its relationship with Exelon was that SDI and ComEd signed an agreement in 1996 to provide digital mapping services for ComEd. (R. 69, Tab 3, 30-33.) SDI's relationship with ComEd is not ongoing. *Id.* SDI has never entered into a contract with Exelon, and Exelon has never asked SDI to enter into a contract with it. (R. 64-1, ¶ 28-29.) Gupta, however, testified

that as a result of the ComEd project, SDI's senior executives have maintained excellent business relationships with the senior executives of both ComEd and Exelon.  In his affidavit, Gupta asserts that "SDI, and its predecessor, have maintained extensive business relationships with senior Exelon executives.  Specifically, I and other senior executives of SDI and its predecessor have maintained business and professional relationships with Exelon executives, including its Chief Executive Officer, over the past approximately 30 years."  (R. 87, Ex. 1, ¶1.) Gupta also avers that he has participated in various civic and charitable activities with Exelon executives.  (*Id.* at ¶ 2.)

Lawrence Houle, an SDI employee, testified that to his knowledge SDI had no ongoing business relationship with Exelon in 2007 and he could not identify any business relationships that SDI lost with Exelon after September 2008.  (R. 69, Tab 4, 13:9-15, 18:8-22, 40:19-41:10.)

### H.      Alleged Partnership Agreement Between SDI and CSC

The parties dispute whether there is a partnership agreement between CSC and SDI.  The parties agree that there is no written, executed partnership agreement between CSC and SDI.  (R. 64-1, ¶ 32.)  SDI asserts that its partnership agreement with CSC was to track the duration of the Exelon Contract, which was for a five-year period with the possibility of three one-year extensions.  (R. 64-1, ¶ 33.)  CSC and SDI never filed a partnership certificate with the County Clerk, nor did CSC and SDI file partnership tax returns.  (R. 64-1, ¶¶ 34-35.)  CSC and SDI did not have a partnership name, and SDI intended its employees to wear SDI name-tags on-site at Exelon to demonstrate SDI's corporate pride.  (R. 64-1, ¶ 36.)  Gupta contends that the proposal to Exelon and "follow-up documentation" constitutes an advertisement for the partnership.  (R. 69, Tab 3, 93:5-15.)  SDI further asserts that the "form of this partnership

agreement is CSC's expressed and direct partnership with us for us to have 15% of the total contract value." (R. 69, Tab 3, 45:5-19.) SDI admits that the use of the word "partner" in a communication is not sufficient to create a partnership agreement. (R. 64-1, ¶ 40.) Cavicchia testified that CSC never signed a written teaming agreement with SDI. (R. 69, Tab 11, ¶ 11.) Gupta testified that besides the 15% partnering agreement with SDI, there was no teaming agreement between CSC and SDI. (R. 69, Tab 3, 97:6-23.)

## LEGAL STANDARD

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Knight v. Wiseman*, 590 F.3d 458 (7th Cir. 2009). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). "Thus, to survive summary judgment, the nonmoving party must present evidence sufficient to establish a triable issue of fact on all essential elements of its case." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009); *see Rozskowiak v. Vill. of Arlington Heights*, 415 F.3d 608, 612 (7th

Cir. 2005) (the nonmoving party must present "evidence on which the jury could reasonably find for the nonmoving party").

**ANALYSIS**

**I.      Choice of Law**

As an initial matter, the parties dispute the law applicable to SDI's claims.  SDI contends that Pennsylvania law governs its claims against CSC because both the Exelon Contract and the purported subcontract between CSC and SDI contained Pennsylvania choice-of-law provisions.  This argument is unavailing.  First, the choice-of-law provision in the Exelon Contract is not applicable to the dispute between CSC and SDI because SDI is not a party to the Exelon Contract.  Moreover, while the proposed subcontract between CSC and SDI also contained a Pennsylvania choice-of-law provision, as discussed at length below, CSC and SDI never entered into that subcontract.  While "Illinois courts honor a contractual choice of law clause provided that (1) it does not contravene a fundamental policy of Illinois, and (2) the state chosen bears a reasonable relationship to the parties or the transaction," *LaSalle Bank Nat'l Assoc. v. Paramont Props.*, 588 F. Supp. 2d 840, 849 (N.D. Ill. 2008), here there is no governing choice-of-law provision because the parties never entered into a contract.  *See Stromberg Metal Works, Inc. v. Press Mech., Inc.,* 77 F.3d 928, 933 (7th Cir. 1996) ("Even the strongest language choosing Maryland law for purposes of interpreting the subcontracts would not necessarily bind Zielinski and the Goldwyns for purposes of personal liability - *they* **did not sign** the contracts.) (emphasis in original).  Accordingly, the Pennsylvania choice-of-law provisions to which SDI points do not govern.

Instead, because this is a diversity case, the Court applies the choice of law rules used by the state in which SDI filed its case, Illinois. Illinois follows the Restatement (Second) of Conflict of Laws in making such decisions. *Midwest Grain Prods. of Ill., Inc. v. Productization, Inc.,* 228 F.3d 784, 787 (7th Cir. 2000) (citing *Esser v. McIntyre*, 169 Ill. 2d 292, 214 Ill. Dec. 693, 661 N.E.2d 1138, 1141 (1996)). "Under traditional Illinois conflict of laws principles, the law of the place where the contract is performed and executed is applicable in determining the validity, construction and obligations of the contract. Where performance and execution occur in different states, the law of the place of performance governs. Where a contract is to be performed in more than one state, the law of place of execution is controlling." *Boise Cascade Home & Land Corp. v. Utils., Inc.*, 127 Ill. App. 3d 4, 12, 468 N.E. 2d 442, 448, 82 Ill. Dec. 180, 186 (1st Dist. 1984); *see also Esser*, 661 N.E.2d at 1141 ("When applying the most significant relationship test, a court should consider (1) where the injury occurred; (2) where the injury-causing conduct occurred; (3) the domicile of the parties; and (4) where the relationship of the parties is centered.").

SDI does not contest that (i) it initiated this lawsuit in Illinois state court, (ii) the parties negotiated the alleged agreements in Illinois, and (iii) the transactions that SDI asserts gave rise to its claims occurred in Illinois. Moreover, SDI further fails to contest that the majority of the work that would be the subject of the alleged partnership and/or subcontractor agreement was related to work to be performed in Illinois, where both Exelon and SDI are headquartered. In addition, none of the parties are domiciled in Pennsylvania. Indeed, SDI makes no effort in its sur-reply, filed in part to respond to the choice-of-law argument, to demonstrate any connection to Pennsylvania other than citing to the inapplicable contractual choice-of-law provisions.

Under either the place of performance test or the most significant relationship test, Pennsylvania law applies.

## II.     Breach of Subcontract Agreement

CSC requests the Court to enter judgment in its favor on SDI's breach of subcontract claim.  To establish a breach of contract under Illinois law, a party must establish: (1) the existence of a valid and enforceable contract; (2) substantial performance of the contract; (3) breach of the contract; and (4) resultant damages.  *See TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 631 (7th Cir. 2007) (citing *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 351 Ill. App. 3d 752, 286 Ill. Dec. 734, 814 N.E.2d 960, 967 (Ill. 2004)).  SDI has not met its burden to demonstrate that CSC and SDI entered into a written or oral subcontract.

### A.     Written Contract

"Included in the formation of a valid contract are offer and acceptance, consideration, and definite and certain terms."  *Carlton at the Lake, Inc. v. Barber*, 928 N.E. 2d 1266, 1270, 340 Ill. Dec. 669, 673 (Ill. App. Ct. 2010) (citing *Zirp-Burnham, LLC v. E. Terrell Assocs., Inc.,* 356 Ill. App. 3d 590, 600, 292 Ill. Dec. 289, 826 N.E.2d 430 (2005)).  "Generally, one of the acts forming the execution of a written contract is its signing."  *Id.* (citing *Hedlund & Hanley, LLC v. Bd. of Tr. of Cmty Coll. Dist. No. 508,* 376 Ill. App. 3d 200, 206, 315 Ill. Dec. 1, 876 N.E. 2d 1 (2007)).  Nevertheless, "a party named in a contract may, by his acts and conduct, indicate his assent to its terms and become bound by its provisions even though he has not signed it."  *Id.* (citing *Landmark Props., Inc. v. Architects Int'l-Chicago,* 172 Ill. App. 3d 379, 383, 122 Ill. Dec. 344, 526 N.E. 2d 603 (1988)).

It is uncontested that CSC never signed the last version of the subcontract agreement that

it sent to SDI. SDI, however, contends that its acceptance of the subcontract, evidenced by its signature, created a subcontract between the parties because CSC had previously admitted to Exelon and in internal documents that it had reached an agreement with SDI. The evidence does support that, after SDI's return of the signed subcontract agreement on September 24, 2008, a number of individuals at CSC believed that the parties had reached agreement. Absent from SDI's response to the motion for summary judgment, however, is any evidence that contradicts the testimony from both Doyle and Nupnau. Both CSC employees were involved in the subcontract negotiations and both testified that after Gupta returned the signed contract on September 24, 2008, he returned a rate card that did not evidence the rate card to which CSC had agreed. SDI repeatedly refers to Doyle's admission that he believed that the parties had reached an agreement after CSC sent the proposed subcontract to SDI in late September. The uncontroverted testimony from multiple CSC employees including Doyle, however, shows that shortly after SDI purportedly agreed to the subcontract, CSC learned that SDI had exchanged the rate cards associated with CSC's proposal for rate cards more favorable to SDI. Immediately thereafter, Doyle emailed SDI with the appropriate rate cards.

SDI's failure to contradict that Gupta switched the rate cards after signing the subcontract is a glaring omission from its response because "[i[t is well settled that in order to constitute a contract by offer and acceptance, the acceptance must conform exactly to the offer." *Finnin v. Bob Lindsay, Inc.*, 366 Ill. App. 3d 546, 548, 852 N.E. 2d 446, 448, 304 Ill. Dec. 196, 198 (Ill. App. Ct. 2006). Indeed, "[u]nder Illinois contract law, an acceptance requiring any modification or change in terms constitutes a rejection of the original offer and becomes a counteroffer that must be accepted by the original offeror before a valid contract is formed." *Id.*;

*see also Abbott Labs v. Alpha Therapeutic Corp.*, 164 F.3d 385, 387 (7th Cir. 1999) (citing *S BL Assoc. v. Village of Elk Grove*, 247 Ill. App. 3d 25, 31, 186 Ill. Dec. 939, 617 N.E. 2d 178, 182 (1993)) ("Under Illinois contract law, a binding agreement requires a meeting of the minds or mutual assent as to all material terms."). Because SDI did not accept the offer made to it by CSC on September 24, 2008, there was no "meeting of the minds" between SDI and CSC. While CSC employees may have believed that the parties had reached an agreement, SDI's proposal of different rate cards constituted a rejection of CSC's offer and separate counteroffer which CSC never accepted. *Finnin*, 366 Ill. App. 3d at 548, 852 N.E. 2d at 448. In short, viewing the facts in the light most favorable to SDI, SDI has established no genuine of material fact with respect to its breach of subcontract claim. The Court accordingly grants summary judgment for CSC in this regard.

### B.      Oral Contract

In addition, to the extent that SDI contends that the subcontract between CSC and SDI was an oral agreement, SDI's breach of contract claim is barred by the Illinois statute of frauds. The Illinois statute of frauds provides, "[n]o action shall be brought . . . upon any agreement that is not to be performed within the space of one year from the making thereof, . . . in writing[ ] and signed by the party to be charged." 740 ILCS 80/1 (West 2004). "Put another way, the statute of frauds prohibits oral contracts that cannot be performed within one year of their making." *Robinson v. BDO Seidman, LLP,* 367 Ill. App. 3d 366, 370, 854 N.E. 2d 767, 772, 305 Ill. Dec. 175, 180 (Ill. App. Ct. 2006). It is undisputed that the alleged subcontract between CSC and SDI was to be for a period of five years with the possibility of three one-year extensions. On its face,

the statute of frauds accordingly bars SDI's breach of subcontract claim. SDI, however, contends that one of three exceptions to the statute of frauds applies to its claim.

SDI first contends that "[CSC] has admitted in sworn testimony that it reached an agreement with SDI on September 23, 2008 with respect to the Subcontract Agreement" and that "sufficient documents signed by [CSC] reflect the terms of the agreement." (R. 85, SDI's Resp. at 10.) Neither of these exceptions, however, is applicable. "When ... there is particularly compelling evidence of the contract's existence, the strictures of the statute of frauds can safely be relaxed, for example in the case of an admission." *Consolidation Servs., Inc. v. KeyBank Nat'l Ass'n,* 185 F.3d 817, 821 (7th Cir. 1999). As in *Trustmark Ins. Co. v. Gen. & Cologne Life Re of Am.*, 424 F.3d 542, 551 (7th Cir. 2005), SDI cites to the same writings its proffers to satisfy the state of frauds to demonstrate that CSC admitted to a subcontract with SDI. "However, under Illinois law the admission must be 'unequivocal' to constitute waiver of a statute of frauds defense." *Id.* As described at length above, the uncontroverted evidence only shows that CSC agreed to the proposed subcontract that it sent to SDI. There is no evidence in the record that CSC ever agreed to the counteroffer from SDI that contained new rate cards. Accordingly, there is no "unequivocal admission" from CSC "that it was contractually bound." *See id.*

SDI also contends that CSC has engaged in conduct that triggers the doctrine of equitable estoppel. "Equitable estoppel is a recognized exception to the statute of frauds." *Carl A. Haas Auto. Imps., Inc. v. Lola Cars Ltd.*, 933 F. Supp. 1381, 1391 (N.D. Ill. 1996). Illinois courts apply equitable estoppel on a showing of the following six elements:

> (1) words or conduct of the party against whom estoppel is alleged, constituting either misrepresentation or concealment of material facts; (2) knowledge on the part of the party against whom estoppel is asserted that the representations were untrue; (3) the party claiming the benefit of estoppel must not have known the

27

representations were false either at the time they were made or at the time they were acted upon; (4) the party estopped must either intend or expect that his conduct or representations will be acted upon by the party asserting estoppel; (5) the party claiming the benefit of estoppel must have relied or acted upon the representations; and (6) the party claiming the benefit of estoppel must be in a position of prejudice if the party against whom estoppel is alleged is permitted to deny the truth of the representations made.

*Id.* In support of its argument that equitable estoppel applies in this context, CSC merely asserts that, "substantial evidence reflects that defendant engaged in a fraudulent scheme to keep the majority of the minority business requirement for itself and to solicit SDI's employees under circumstances that trigger equitable estoppel." (R. 85, SDI's Resp. at 10.) This conclusory assertion is insufficient to demonstrate the many elements of a claim for equitable estoppel. Moreover, "any arguments that are unsupported or underdeveloped are deemed waived." *Gates v. Towery*, 507 F. Supp. 2d 904 (N.D. Ill. 2007.) SDI, for example, has pointed to no evidence that CSC intended or expected that SDI would act upon its representations. *See Carl A. Haas Auto. Imps.*, 933 F. Supp. at 1391. The purported oral subcontract between CSC and SDI was for a period of five years and, even viewing the facts in the light most favorable to SDI, SDI has not demonstrated that any of the exceptions to the Illinois statute of frauds are available to it. The Court accordingly grants CSC's motion for summary judgment with respect to SDI's breach of subcontract claim.

## III. Tortious Interference With Prospective Business Advantage

CSC also requests the Court to grant summary judgment against SDI on its claim for tortious interference with prospective business advantage. To succeed on a claim for tortious interference with prospective business advantage under Illinois law, a plaintiff must demonstrate: (i) a reasonable expectation of entering into a valid business relationship, (ii) that defendant

knew of this expectancy, (iii) that defendant purposefully interfered to prevent the expectancy from being fulfilled, and (iv) resulting damages to plaintiff from the interference. *Cook v. Winfrey*, 141 F.3d 322, 327 (7th Cir. 1998) (citing *Delloma v. Consol. Coal Co.,* 996 F.2d 168, 170-71 (7th Cir. 1993); *Fellhauer v. City of Geneva,* 142 Ill. 2d 495, 154 Ill. Dec. 649, 568 N.E. 2d 870, 878 (1991)). In its complaint, SDI identifies three purported business expectancies: (i) a continuation of its "long-term" business relationship with Exelon, (ii) receipt of 15% of Exelon's information technology business, and (iii) continuation of its business relationships with the 29 IT specialists that it hired and recruited.

The Court will address each purported expectancy in turn. First, with respect to the alleged long-term relationship with Exelon, the record does not support that SDI had any such expectation. In his affidavit, the deficiencies of which were addressed in detail above, Gupta conclusorily asserted that SDI and Exelon had long term business relationships. Gupta, however, was only able to point to one contract that SDI entered into with a subsidiary of Exelon in the 1990s that is not ongoing. In short, there is no evidence in the record to demonstrate any expectation of a long-term business relationship between SDI and Exelon. Second, with respect to receipt of 15% of Exelon's information technology business, SDI never entered into a contract with Exelon. While SDI engaged in negotiations with CSC to potentially enter into a subcontractor agreement with Exelon, there is no evidence in the record that Exelon intended SDI to receive 15% of its information technology business. Third, with respect to the continuation of its relationships with the 29 IT specialists, SDI rescinded all of its offers to these individuals because it had not reached agreement with CSC.

SDI's response to the vast record evidence cited by CSC and CSC's arguments in support of its motion for summary judgment with respect to SDI's tortious interference with prospective business advantage claim is lacking. The full extent of SDI's response to CSC's contention that none of SDI's alleged expectations were in fact reasonable is that: "That factual argument is not supported by the evidence on which defendant relies, and it also is contradicted by substantial evidence. (SAF, ¶¶ 13-5.) At a minimum, material issues of fact exist on this element." (R. 85, SDI's Resp.) The cited paragraphs of SDI's statement of facts merely establish that SDI unilaterally decided to recruit and hire IT specialists, that CSC stressed the benefits of the CSC-SDI relationship to Exelon, and that SDI met with Exelon to discuss its potential agreement with CSC. It is not the province of the Court to make arguments for a party. As noted above, "any arguments that are unsupported or underdeveloped are deemed waived." *Gates*, 507 F. Supp. at 904 (N.D. Ill. 2007.) Even viewing the facts in the light most favorable to SDI, the uncontroverted evidence in the record demonstrates that SDI did not have reasonable expectations of prospective business relationships. Given its limited response, SDI has not established a genuine issue of material fact in this regard. The Court accordingly grants CSC's motion for summary judgment with respect to SDI's tortious interference with prospective business advantage claim.

## IV. Breach of Fiduciary Duty

CSC further seeks summary judgment on SDI's claim for breach of fiduciary duty. SDI premises its breach of fiduciary duty claim on an alleged partnership between SDI and CSC. The parties, however, dispute whether there is a partnership agreement between CSC and SDI. Because CSC has demonstrated no genuine issue of material fact as to the existence of a

partnership between CSC and SDI, the Court grants CSC's motion for summary judgment on SDI's breach of fiduciary duty claim.

"Under the Uniform Partnership Act, a partnership is an association of two or more persons to carry on, as co-owners, a business for profit." *Snyder v. Dunn*, 265 Ill. App. 3d 891, 893-94, 638 N.E. 2d 744, 202 Ill. Dec. 876, 879 (Ill. App. Ct. 1994) (citing Ill. Rev. Stat. 106 1/2, par. 6(1)). Under the Uniform Partnership Act, "the sharing of profits constitutes *prima facie* evidence of the existence of a partnership; however, the sharing of losses is not specified as a prerequisite to the recognition of a partnership." *Id.* "In addition to profit sharing, to determine the existence of a partnership, the court considers such factors as the manner in which the parties have dealt with each other; the mode in which each has, with the knowledge of the other, dealt with persons in a partnership capacity and whether the alleged partnership has advertised using the firm name." *Id.* "Furthermore, such factors as whether the parties have filed a partnership certificate with the county clerk, in the event the firm name does not include the true name of the persons transacting such partnership business and whether they have carried telephone listings using the firm name are also of import." *Id.*

The parties agree that there is no written, executed partnership agreement between CSC and SDI. (R. 64-1, ¶ 32.) SDI asserts that its partnership agreement with CSC was to track the duration of the Exelon Contract, which was for a five-year period with the possibility of three one-year extensions. (R. 64-1, ¶ 33.) Besides relying on unsubstantiated portions of Gupta's affidavit, as discussed above, SDI points to three pieces of evidence to demonstrate the existence of a partnership. First, SDI points to a December 5, 2007 email in which CSC states to SDI: "We want to partner with SDI. Nancy Stewart WILL be sending you the NDA today for sure!

We look forward to working with you."  (R. 87, Ex. 7.)  SDI also relies on a December 13, 2007

email in which CSC states that it has "decided to partner exclusively with SDI for our proposal

to Exelon.  We have signed off on the other part.  I have asked Nancy Stewart to get the teaming

agreement to you asap . . . .  Please communicate our thanks to everyone on your team for

yesterday and our excitement about the partnership."  (R. 69, Tab 19; R. 87, Ex. 9.)  The email

contains a disclaimer, however, that:  "Regardless of content, the e-mail shall not operate to bind

CSC to any order or other contract unless pursuant to explicit written agreement or government

initiative expressly permitting the use of e-mail for such purpose."  *Id.*  Moreover, neither email

details any rights, obligations or financial responsibilities of the parties.  *Id.*  Finally, SDI relies

on the deposition testimony of Burns who stated that SDI and CSC agreed to "partner" together

to obtain the Exelon business in the Fall of 2007.  (R. 87, Ex. 8, 51:24-53:3.)  Burns also stated

that "CSC and SDI agreed that SDI would be the exclusive minority business partner with

respect to the Exelon business and that SDI would perform desktop services in connection with

the Exelon project."  *Id.*

Based on this evidence, SDI contends that it has established a partnership because (i)

CSC admitted the terms of the partnership orally and in writing,[12] (ii) CSC issued press releases

advertising its partnership with SDI, (iii) CSC admitted to Exelon that CSC and SDI were "true

partners" and shared the risks and rewards of the partnership, and (iv) CSC and SDI agreed to

---

[12]  To the extent that SDI premises its partnership claim on oral representations, the claim is barred by the statute of
frauds because SDI has stated that the partnership between CSC and SDI was to be for a period of five years with the
possibility of three one-year extensions.  *See* 740 ILCS 80/1 (West 2004) ( "[n]o action shall be brought . . . upon
any agreement that is not to be performed within the space of one year from the making thereof, . . . in writing[ ] and
signed by the party to be charged"); *see also Taimoorazy v. Bloomington Anesthesiology Serv., Ltd.*, 122 F. Supp.
2d 967, 972 (C.D. Ill. 2000) ("purported partnership agreement contemplated a performance duration of longer than
one year, bringing the alleged agreement squarely within the bar of the Statute of Frauds") (citing *Cargo, Inc. v.
Allstates Air Cargo, Inc.,* 1998 WL 601910, at *2 (N.D. Ill. Sept. 9, 1998)).

pursue the Exelon business together.  SDI, however, fails to demonstrate how these factual allegations demonstrate a partnership under Illinois law.

With regard to the emails, SDI admits that the use of the word "partner" in a communication is not sufficient to create a partnership agreement.  (R. 64-1, ¶ 40.)   As another court in this district has stated:  "We refuse to infer their relationship to be that of partners simply because that is how these long-standing business associates referred to one another when behind closed doors.  Instead, we look to the structure of the entities they created and then presented to the community at large."  *Longview Aluminim, L.L.C. v. Indus. Gen., L.L.C.,* No. 02 C 0168, 2003 WL 21518585, *7 (N.D. Ill. 2003).  While CSC and SDI referred to one another as "partners" in the colloquial sense, and made the same representation to Exelon, SDI has presented no evidence to demonstrate that the parties met the indicia of partnership under Illinois law.  SDI and CSC never filed a partnership certificate with the County Clerk, nor did SDI and CSC filed partnership tax returns.  (R. 64-1, ¶¶ 34-35.)  CSC and SDI did not have a partnership name, and SDI intended its employees to wear SDI name-tags on-site at Exelon to demonstrate SDI's corporate pride.  (R. 64-1, ¶ 36.)  Critically, there is no evidence in the record to demonstrate that CSC and SDI intended to share profits.  Indeed, SDI asserts that the "form of this partnership agreement is CSC's expressed and direct partnership with us for us to have 15% of the total contract value."  (R. 69, Tab 3, 45:5-19.)  SDI has presented no evidence or argument to contradict CSC's assertion that 15% of the total contract value did not constitute a sharing of profits.

In sum, SDI has merely presented evidence to support that its alleged "partnership" with CSC was to pursue the Exelon business.  While the parties agreed to jointly pursue the Exelon

business, without presenting any evidence to support a sharing of profits or any of the other indicia of a partnership under Illinois law, even viewing the facts in the light most favorable to SDI, SDI has not established a genuine issue of material fact with regard to its breach of fiduciary duty claim. *See, e.g., Maloney v. Pihera*, 215 Ill. App. 3d 30, 573 N.E. 2d 1379, 158 Ill. Dec. 194 (Ill. App. Ct. 991) (evidence was insufficient to establish that parties entered into partnership for purpose of developing parcels of land where, with the exception of one piece of property, parties purchased and held title to parcels of property individually, at least one employee worked only solely for one of the parties, parties only shared nominal income from trailer-rental profits on one jointly held parcel, and there was never any agreement on several vital terms of alleged partnership, including scope of parties' duties and duration of purported partnership.) The Court therefore grants summary judgment for CSC in this respect.

## V.      Quantum Meruit

CSC also seeks summary judgment against SDI on SDI's claim for quantum meruit. Under Illinois law, the equitable theory of quantum meruit "is founded on the implied promise of a recipient of services to pay for such valuable services, as otherwise the recipient would be unjustly enriched." *Carlton at the Lake, Inc. v. Barber*, 928 N.E. 2d 1266, 1272, 340 Ill. Dec. 669, 675 (Ill. App. Ct. 2010). To succeed on its *quantum meruit* claim, SDI must show: (1) it performed a service to benefit CSC; (2) it performed this service non-gratuitously; (3) CSC accepted this service; and (4) no contract existed to prescribe payment of this service. *Owen Wagener & Co. v. U.S. Bank*, 297 Ill. App. 3d 1045, 1053, 697 N.E. 2d 902, 908, 232 Ill. Dec. 160, 166 (Ill. App. Ct. 1998) (citing *Rohter v. Passarella,* 246 Ill. App. 3d 860, 186 Ill. Dec. 807, 617 N.E. 2d 46 (Ill. App. Ct. 1993); *Vill. of Clarendon Hills v. Mulder,* 278 Ill. App. 3d 727, 215

Ill. Dec. 424, 663 N.E. 2d 435 (Ill. App. Ct. 1996); *First Nat'l Bank of Springfield v. Malpractice Research, Inc.,* 179 Ill. 2d 353, 365, 228 Ill. Dec. 202, 688 N.E.2d 1179 (Ill. 1997)).

SDI alleges that is performed services for CSC's benefit by (i) working with CSC to submit a proposal to Exelon, (ii) participating in interviews with the Exelon team, (iii) securing the Exelon account, (iv) recruiting IT specialists to work on the Exelon account, (v) hosting CSC employees at its offices and providing work space and equipment, and (vi) conducting field surveys of Exelon project sites. SDI, however, has not presented any evidence to the Court that it provided any service to CSC *non-gratuitously.* *See Owen Wagener*, 297 Ill. App. 3d at 1053, 697 N.E. 2d at 908. As CSC notes in its response, "any service that SDI provided to CSC was done so gratuitously, at SDI's suggestion, and without any expectation of compensation from CSC." (R. 64, CSC's Mot. for Summary Judgment at 19.) The evidence presented by the parties does

not indicate that SDI ever requested compensation from SDI for its efforts or that SDI ever attempted to invoice CSC for its services.

SDI's response to this contention, and its entire argument regarding its claim for quantum meruit, is that the argument that SDI's services were provided gratuitously "is contradicted by the evidence" and "contradicted by defendant's admission in its Answer . . . and in the testimony of defendant's Rule 30(b)(6) corporate representative and other substantial evidence."[13] (R. 85, SDI's Resp. at 14.) SDI, however, once again fails to identify or detail any of the evidence, or to present any argument to the Court, that the evidence demonstrates that SDI provided the services non-gratuitously. The Court has nonetheless reviewed the evidence submitted by the parties.

---

[13] The citation to an admission by CSC in its Answer is improper as CSC's Amended Answer superseded its original Answer to the Complaint. (R. 71, Amended Answer.)

Even viewing the facts in the light most reasonable to SDI, the evidence cited by SDI makes no showing that SDI expected payment for its services. *See Bernstein and Grazian, P.C. v. Grazian and Volpe, P.C.*, 931 N.E.2d 810, 826, (Ill. App. Ct. 2010) ("[t]he mere fact that a person benefits another is not of itself sufficient to require the other to make restitution therefor"). The Court accordingly grants CSC's motion for summary judgment in this regard.

## VI. Equitable Estoppel

CSC also seeks summary judgment on SDI's claim for equitable estoppel.[14] "District courts in Illinois have split on whether promissory and equitable estoppel can be plead as affirmative claims under Illinois law." *Glazer v. Abercrombie & Kent, Inc.,* No. 07 C 2284, 2008 WL 4372032, *3 (N.D. Ill. Sept. 23, 2008). "Many courts have held that estoppel is only an affirmative defense and does not constitute an independent cause of action." *Id.* (citing *Cont'l Mktg., Ltd. v. Home Depot U.S.A., Inc.*, 07 C 5152, 2008 WL 2726908 at *2 (N.D. Ill. July 10, 2008)). As in *Glazer*, however, the Court need not determine whether equitable estoppel constitutes an independent cause of action under Illinois law because, even viewing the facts in the light most favorable to SDI, SDI has failed to demonstrate a genuine issue of material fact with respect to this claim. To establish equitable estoppel, the party claiming estoppel must demonstrate that:

> (1) the other person misrepresented or concealed material facts; (2) the other person knew at the time he or she made the representations that they were untrue; (3) the party claiming estoppel did not know that the representations were untrue when they were made and when they were acted upon; (4) the other person intended or

---

[14] On September 9, 2010, the Court granted SDI's motion for leave to file supplemental authority. (R. 107, Minute Entry.) SDI contends that the analysis in *I.C.S. Ill., Inc. v. Waste Mgmt. of Ill., Inc.*, 931 N.E. 2d 318 (Ill. App. Ct. 2010), is "similar to the analysis that applies under Pennsylvania law concerning the enforceability of promises made during an RFP process that includes a subcontract." As the Court described above, however, Pennsylvania law does not govern SDI's claims. Moreover, the case cited by SDI does not address any of the claims contained in SDI's complaint.

reasonably expected that the party claiming estoppel would act upon the
representations; (5) the party claiming estoppel reasonably relied upon the
representations in good faith to his or her detriment; and (6) the party claiming
estoppel would be prejudiced by his or her reliance on the representations if the
other person is permitted to deny the truth thereof.

*Geddes v. Mill Creek Country Club, Inc.*, 196 Ill. 2d 302, 313-314, 751 N.E. 2d 1150, 115, 256

Ill. Dec. 313, 320 (2001).

The Court need not address each element of a claim for equitable estoppel because there

is no evidence in the record to demonstrate that CSC misrepresented or concealed material facts.

In its Amended Complaint, SDI alleges that CSC made the following misrepresentations: (i) SDI

was CSC's exclusive minority partner under the Exelon Contract, (ii) CSC would pay SDI at a

minimum 15% of the minority business payments that Exelon required under the Exelon

Contract, (iii) SDI would provide the specific desktop services to Exelon that were specified in

the Exelon RFP, (iv) SDI and CSC were "true partners" on the Exelon Contract and would share

all risks and rewards pursuant to the Exelon Contract, (v) SDI would be the single point of

contact for desktop services under the Exelon Contract, (vi) the terms of the Exelon RFP and

Exelon Contract would "flow down" to SDI, (vii) CSC would not solicit SDI's employees at the

end of the term of the Exelon Contract, and (viii) SDI and CSC had reached an agreement on the

proposed subcontract.[15]

With the exception of the final alleged misrepresentation, each of SDI's allegations

premised on terms of the proposed subcontract, the Exelon Contract, or the Exelon RFP cannot

form the basis for a claim for equitable estoppel, if one is available, because they concern

promises of future action. Each of the alleged misrepresentations derives from obligations or

---

[15]  This allegation fails as a matter of law because the Court has found that there was no subcontract agreement
between SDI and CSC.

promises pursuant to the Exelon Contract or the proposed CSC-SDI contract, which were not in effect at the time the statements were made. To establish a claim for equitable estoppel, "the 'material facts' must be existing facts, not promises of future action." *Intern. Strategic Mktg., Inc. v. Zenith Intern., S.A.*, 2004 WL 546998, *2 (N.D. Ill. 2004) (citing *Ozier v. Haines*, 343 Ill. App. 400, 99 N.E. 2d 395, 396 (Ill. App. Ct. 1951), *aff'd.*, 411 Ill. 160, 103 N.E. 2d 485 (1952)); *see also Gen. Elec. Co. v. Honeywell Intern., Inc.*, No. 05-3239, 2006 WL 988468, *14 (C.D. Ill. 2006) ("[t]o be actionable, a false representation must generally relate to an existing or past event, not to a promise or prognostication concerning a future happening") (citing *Sinclair v. Sullivan Chevrolet Co.*, 202 N.E. 2d 516, 518 (Ill.1964)). "Action taken in reliance on such promises, as distinguished from action taken in reliance on a misrepresentation of existing facts, cannot raise an estoppel." *Intern. Strategic Mktg.*, 2004 WL 546998 at *2. For example, in a case in which the Illinois Appellate Court held that equitable estoppel did not apply where the defendant promised to sell corn to the plaintiff at a certain price, but later reneged on that promise, the court explained:

> Promises as to future action are not misrepresentations of existing facts. Action taken in reliance on such promises, as distinguished from action taken in reliance on a misrepresentation of existing facts, cannot raise an estoppel. While it is true that equity will not allow the Statute of Frauds to be a shield to shelter a fraud, the breach of a promise which the law does not regard as binding, is not a fraud. There does appear to be a moral wrong, but if we attempted to right this moral wrong under these conditions, the Statute would be rendered nugatory. The plaintiffs are presumed to know the law, and they could easily have protected themselves by making a part payment on the contract, or by preparing a written memorandum of the contract.

*Ozier*, 343 Ill. App. 400, 403, 99 N.E. 2d 395, 396 (Ill. App. 1951). While the *Ozier* case involved a simple oral contract for the purchase of corn, the factual scenario is quite similar to that presented by SDI. Each of the representations that SDI points to similarly derive from the

38

parties' pre-contractual negotiations. SDI is a sophisticated business entity that is charged with knowledge of contract law. Without a binding agreement, there is no legal wrong. Moreover, in response to CSC's argument that each of the alleged misrepresentations is merely a promise of future action, CSC attempts to characterize the statements as misrepresentations of SDI's "then-existing state of mind." This argument is not persuasive. SDI does not explain how statements regarding the parties rights and responsibilities under a potential future contract, or a contract between CSC and a third party that was not yet effective, do not relay promises of future action. Because each of CSC's alleged misrepresentations is a promise as to future action, the Court grants CSC's motion for summary judgment on SDI's claim for equitable estoppel.

## CONCLUSION

For the foregoing reasons, the Court grants CSC's motion for summary judgment on Counts I through IV of SDI's complaint and CSC's motion for summary judgment on Court V of SDI's complaint.

DATED: September 13, 2010                    ENTERED:

_____
AMY J. STEEVE
United States District Court Judge