**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SYSTEM DEVELOPMENT INTEGRATION, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | No. 09-CV-4008 |
| ) | |
| COMPUTER SCIENCES CORPORATION, ) | Honorable Amy J. St. Eve |
| ) | |
| Defendant. ) | |

**SDI'S OPPOSITION TO CSC'S MOTION TO EXCLUDE EXPERT TESTIMONY OF
MICHAEL G. MAYER REGARDING DAMAGES**

System Development Integration, LLC ("SDI") responds as follows to the Motion to Exclude Expert Testimony of Michael Mayer filed by Computer Systems Corporation ("CSC"):

**INTRODUCTION**

At trial, SDI intends to offer Michael G. Mayer to provide expert testimony regarding: (a) the damages suffered by SDI as a result of CSC's breach of the Subcontract Agreement (Count I); and (b) the economic cost to SDI in providing a benefit to CSC as well as the economic enrichment of CSC as a result of the successful bid for the Exelon business, either of which may be considered by the jury in assessing a fair and appropriate award on SDI's alternative claim for *quantum meruit* (Count IV). Mayer's report is clearly explained and contains extensive citations to support each conclusion, including citations to key documents, deposition testimony, and financial records, as well as supporting spreadsheets, calculations, and other attached schedules.

CSC seeks to bar Mayer from testifying at trial based upon alleged confusion about his report, mischaracterizations of his opinions, and inaccurate statements of the evidence to be introduced at trial. Specifically, CSC argues (CSC Br. at 2) that "Mayer's damages calculations

1

rely solely on the untested, internal projections of SDI," but Mayer relies on the parties' written Subcontract Agreement (including its rate schedules) as well as information from CSC and Exelon. CSC also accuses Mayer of "failing to identify all the evidence he considered" in forming his opinions (*id.* at 9 n.13), but Exhibit 2 to his report contains a complete, five-page listing of such evidence. Further, CSC attacks the report for being only 20 single-spaced pages (*id.* at 9), even though there is no minimum length for an expert report and CSC ignores the report's extensive exhibits, which lay out in even greater detail the bases of Mayer's opinions.

CSC's attack also misses the mark on the two claims for trial. First, CSC mistakenly suggests that a "new business rule" bars expert testimony about lost profits under the Subcontract Agreement. Second, CSC mischaracterizes Mayer's opinions regarding *quantum meruit*. Contrary to CSC's argument (*id.* at 5), Mayer does not assume SDI was "the sole reason CSC was granted the contract with Exelon," but instead provides expert testimony to assist the jury in arriving at a fair and appropriate award based on its own assessment of the evidence at trial.

Finally, CSC's request to exclude expert testimony about the amount of SDI's damages for breach of the partnership agreement (Count III) should be denied as moot because the Court has previously granted summary judgment on that claim.

## ARGUMENT

Under Rules 702 and 703 of the Federal Rules of Evidence, the Court should reject an attempt to bar an expert from testifying where, as here: (a) the witness is qualified to be an expert by knowledge, skill, experience, training, or education in the relevant field; (b) the opinions result from the application of reliable principals and methods to sufficient facts or data; and (c) the testimony is relevant because it would assist the trier of fact in performing its job of

understanding the evidence and resolving the disputed issues. *Hill v. City of Chicago*, No. 06 C 6772, 2011 WL 2461362, at *1 (N.D. Ill. June 20, 2011) (St. Eve, J.).

I. **Mayer is Qualified to Offer Expert Opinions Regarding SDI's Damages.**

On page 1 of its brief, CSC suggests that Mayer is "not an expert qualified in a relevant subject matter," but CSC fails to back that up with any meaningful support. In fact, Mayer is well-qualified to testify as an expert on damages, based on his education, training, and extensive experience in the field. He has a Master of Business Administration ("MBA") degree in Finance and Management Policy from the Kellogg Graduate School of Management at Northwestern University, as well as a Bachelor of Science degree, with distinction, from the Indiana University School of Business. (Mayer Rpt. at Ex. 1.) Mayer also is a Chartered Financial Analyst ("CFA") and a Certified Fraud Examiner ("CFE"). He has testified as an expert in more than 60 matters, including cases involving various damages issues, such as lost profits, loss of principal, and prejudgment interest. (*Id.*) Mayer also served as a Damages Consultant to the Enron Creditors Committee in connection with the Enron bankruptcy proceedings. (*Id.*) Exhibit 1 of Mayer's report contains additional information about his experience and qualifications.

In short, Mayer is well-qualified to testify about damages in this case, and CSC does not seriously contend otherwise. *See generally USA Satellite & Cable, Inc. v. N. Am. Cable Equip., Inc.*, 09 C 2067, 2011 WL 1692391, at *3 n.1 (N.D. Ill. May 2, 2011) (expert with CFA, CFE, and previous experience consulting on economic damages in litigation qualified to testify).

II. **SDI Can Recover Lost Profits for Breach of the Subcontract Agreement, and CSC's Attack on Mayer's Methodology Has No Merit.**

CSC takes several potshots at Mayer in discussing his opinions about SDI's damages under the Subcontract Agreement, but does not adequately or accurately summarize his report. Consequently, below is a summary of his methodology and conclusions about SDI's lost profits.

3

### A. Mayer's Calculation of Damages Under the Subcontract Agreement.

Mayer's opinion regarding SDI's damages for breach of the five-year Subcontract Agreement is based upon a well-accepted, lost-profits methodology. Pages 13 through 18 of his report discuss his analysis and conclusion that those damages, when appropriately discounted to present value, amount to $3,018,691, if one *excludes* the three-year option that was available to Exelon under the Exelon Contract. Mayer also explains that the damages would rise in years six, seven, and eight of the Exelon Contract, but he does not opine about whether the jury should award such damages based upon the evidence to be introduced at trial. (Mayer Rpt. at 16.)

Mayer arrived at the $3,018,691 figure by: (a) determining SDI's lost revenues under the Subcontract Agreement; (b) subtracting various, itemized "incremental expenses" that SDI would have incurred on the project, such as salaries, benefits, costs of computers, etc.; and (c) applying a "present value discount" to account for the time value of money. (Mayer Rpt. at 14-16.) This methodology is widely accepted. *See, e.g., Intervisual Commc'ns, Inc. v. Volkert*, 975 F. Supp. 1092, 1106 (N.D. Ill. 1997) ("In Illinois, lost profits are calculated by subtracting from revenue lost as a result of a breach those costs avoided as a result of the same breach.").

Mayer's calculations are further explained in detailed schedules attached as Exhibits 5.1, 5.2, 5.3, and 5.4 to the report. In footnote 70, Mayer discusses why his damages opinions are conservative because he did not assume that SDI would obtain the benefit of any "add-on" services (which inevitably occur in the course of such multi-year service agreements). Instead, Mayer used only the "base numbers" identified in the Subcontract Agreement.

Mayer also performed a "reasonableness test" to check whether his results were generally consistent with the results SDI achieved on three other projects involving similar, long-term

4

computer-support services.  (Mayer Rpt. at 17-18, Ex. 5.6.)  He concluded that the results of his lost-profits calculations were in line with SDI's profits on the three comparable projects.  (*Id.*)

    **B.**  **The Court Should Reject CSC's Attempt to Exclude Mayer's Testimony Regarding SDI's Lost-Profits Damages.**

CSC attacks Mayer's opinion (1) by referring to a so-called "new business rule" and (2) by accusing him of "unreliable," "unsupported assumptions."  Both arguments are without merit.

    **1.**  **CSC's "New-Business-Rule" Argument Is Contrary to Law.**

CSC claims SDI is barred from recovering lost-profits because "[a]s a general rule, a new business has no right to recover lost profits."  (CSC Br. at 10.)  According to CSC, Mayer should be excluded because "[t]he Exelon Contract was by all accounts a new venture for either CSC and [sic] SDI, and one of a size and nature under which SDI had never undertaken [sic]." (*Id.*)

CSC misunderstands the law regarding lost-profits damages and, in any event, ignores the fact that SDI is not a new business, but instead SDI has been operating for approximately 19 years as an information and technology business.  Under Illinois law, a party is ordinarily entitled to its expectation damages for breach of contract and, in many cases, expectation damages are comprised of lost profits.  *Intervisual Commc'ns, Inc.*, 975 F. Supp. at 1106; *see also* Restatement (2d) Contracts § 347; Reference Manual on Scientific Evidence 284 (2d ed. 2000).  Contrary to CSC's argument, the standard for awarding lost profits depends not upon whether the plaintiff is a "new business," but instead whether its loss is proved with a reasonable degree of certainty.  *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 856 N.E.2d 389, 407, 222 Ill. 2d 218, 249 (Ill. 2006).  Due to their prospective nature, lost profits are, to a certain extent, "uncertain and incapable of calculation with mathematical precision."  *Id.* at 407, 222 Ill. 2d at 249; *see also Milex Prods., Inc. v. Alra Labs., Inc.*, 603 N.E.2d 1226, 1236, 237 Ill. App. 3d 177, 190 (Ill. App. Ct. 1992).  Consequently, although the *existence* of damages must be proven to a

reasonable degree of certainty, the *amount* of damages may be shown by expert testimony or other evidence that reasonably estimates the damages incurred. *Tri-G, Inc.*, 856 N.E.2d at 407, 222 Ill. 2d at 248.

It is sometimes said that a new business cannot recover lost-profits, but that is not always true; even newly established businesses can recover lost-profits if they satisfy the standards. *Id.* ("There is no inviolate rule that a new business can never prove lost profits."); *see also Milex*, 603 N.E.2d at 1237, 237 Ill. App. 3d at 193.

Moreover, SDI cannot fairly be described as a "new business." SDI has for many years provided computer support for its customers, including 911 call centers, airports, municipalities, and other institutions. (Mayer Rpt. at 17; dkt. no. 83 at ¶ 5.) SDI is experienced in providing deskside support and similar services. (Mayer Rpt. at 17; SDI080895-1318 at 1317.) Under these circumstances, it is not appropriate for CSC to label SDI a new business.[1] (CSC Br. at 10.)

In this case, SDI's lost profits can and will be fully supported by the evidence, including the terms of the Subcontract Agreement and testimony about SDI's capabilities and experience. Such evidence provides a sufficient basis for the assessment of lost-profits damages. *See Tri-G, Inc.*, 856 N.E.2d at 407, 222 Ill. 2d at 249-50 (rejecting defendant's argument that evidence of past success in a similar enterprise cannot support an award of lost profits). At trial, CSC may cross-examine witnesses, including Mayer, but there is no basis for CSC's request to exclude Mayer's testimony based on a so-called "new business rule."

---

[1] Nor is there merit to CSC's argument that a plaintiff is precluded from recovering lost profits for work for a particularly large customer or for services that differed in certain respects from the plaintiff's typical services. *See, e.g.*, *Lyman v. St. Jude Med. S.C., Inc.*, 580 F. Supp. 2d 719, 724 (E.D. Wis. 2008) (expert properly relied on sales quotas in plaintiff's new sales contract with defendant to predict future sales; the contract was not newly-forming or hypothetical because plaintiff previously sold similar products in the territory); *Strasheim v. Amoco Oil Co.*, No. 84 C 10132, 1991 WL 214158, at *2 (N.D. Ill. Oct. 16, 1991) (automotive repair shop's addition of new equipment and services did not constitute new business). At most, CSC's argument goes to the weight, not admissibility, of Mayer's testimony. *Mid-Am. Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1362-63 (7th Cir. 1996).

### 2. Mayer's Methodology is Reliable.

CSC argues that Mayer's lost-profits methodology is unreliable because he allegedly makes "unsupported and unfounded assumptions." (CSC Br. at 5.) CSC's brief contains a barrage of buzzwords on the subject of his methodology (*e.g.*, "merely parrots information," uses "numbers spoon fed to him by SDI," is "fundamentally . . . an advocate"). Ultimately, however, when its attacks are boiled down, CSC makes five arguments, none of which has any merit.

First, CSC erroneously argues that Mayer relies "solely on the untested, internal projections of SDI" and that his "numbers could have been picked from anywhere and developed in any number of undisclosed manners [sic]." (CSC Br. at 2, 8.) To the contrary, Mayer's calculations are explained in his report and the data upon which he relied to calculate SDI's lost revenues under the Subcontract Agreement came directly from the Subcontract Agreement itself. (*Compare* Mayer Rpt. at Exs. 5.0, 5.1, 5.1.1, 5.1.2, 5.1.3, 5.1.4, and 5.1.5, *with* Subcontract Agreement, portions of which are attached as Exhibit A, at Exs. C-1 and C-2.)

Naturally, when considering SDI's "incremental expenses" (which he subtracted from lost revenues when calculating lost profits), Mayer relied on data from SDI, such as employee salary and benefit figures and overhead data. It is proper and necessary to look to SDI for information about SDI's own, internal costs. *Minemyer v. B-Roc Representatives, Inc.*, No. 07 C 1763, 2009 WL 3757378, at *5-7 (N.D. Ill. Oct. 29, 2009); *Platypus Wear, Inc. v. Clarke Modet & Co.*, No. 06-20976-CIV, 2008 WL 4533914, at *5 (S.D. Fl. Oct. 7, 2008). Moreover, CSC is free to cross-examine Mayer and any other relevant witnesses about such data at trial.

Second, CSC argues that Mayer "fail[ed] to consider alternatives, such as SDI's numerous rejections of proposed contracts." (CSC Br. at 5 n.3.) CSC contends that Mayer should

have assumed that there was no Subcontract Agreement when attempting to calculate damages for breach of the Subcontract Agreement, but that is illogical and wrong. *Cf. Platypus Wear*, 2008 WL 4533914, at *6 ("[E]very expert witness who calculates damages sustained from a breach of a given contract must assume the contract's enforceability under the law.").[2]

Third, CSC erroneously states that Mayer assumed that SDI was the "sole reason CSC was granted the contract with Exelon." (CSC Br. at 5.) Not so. Mayer calculated lost-profits according to a well-accepted methodology, and there is no basis for CSC to say that he assumes CSC had no role in securing the Exelon business. Moreover, in discussing SDI's separate, *quantum meruit* claim, Mayer explains that he is not opining on the degree to which SDI was responsible for the successful bid for the Exelon business, which is for the jury to decide.

---

[2] In footnote 4 of its brief, CSC makes the vague and sweeping allegation that Mayer should have analyzed various hypothetical contingencies, such as what might have happened if CSC or SDI had been terminated or performed at "fluctuating service levels." But there is simply no such requirement, and an expert should not be barred from testifying merely because he or she has not evaluated every possible contingency. *Fid. Nat'l Title Ins. Co. v. Intercounty Nat'l Title Ins. Co.*, No. 00 C 5658, 00 C 7086, 2003 WL 2005233, at *8 (N.D. Ill. Apr. 30, 2003). CSC cites two cases to try to say otherwise, but neither supports its position and each is distinguishable. Its first case, *Fail-Safe, LLC v. A.O. Smith Corp.*, 744 F. Supp. 2d 870 (E.D. Wis. 2010) (applying Wisconsin law, but cited no fewer than seven times throughout CSC's brief), does not even remotely resemble the circumstances at issue in the case at bar, in which CSC's termination of SDI deprived SDI of revenues from a particular, limited source pursuant to detailed rates that were agreed to by the parties. In *Fail-Safe*, the court was faced with the easily distinguishable situation in which the plaintiff, a motor manufacturer, sued a pool-pump distributor for trade secret misappropriation and unjust enrichment and sought royalty-payment damages based on defendant's likely future revenues in the *open market over the next ten (10) years*. Still further, to attempt to support its claims in *Fail-Safe*, the plaintiff sought to introduce testimony from two experts, Dr. Keegan and Mr. Fox, each of whom dramatically and fundamentally changed his expert opinion during the course of the litigation. *Id.* at 879, 883. The court found the purported experts' opinions to be deeply flawed for many reasons, explaining that Keegan made "several incredible assumptions that belie basic logic," including about some of the most important factors that would affect market share, and that Fox's opinions were woefully flawed and imprecise because, among other things, his first report generally estimated damages to be "somewhere between 13 million and 144 million dollars," and his second report calculated them at "between 9.4 million and 102.9 million dollars." *Id.* at 880-83, 887, 891. In addition, the *Fail-Safe* court explained that it was restricting its analysis to unjust enrichment, which it explained to be a more restrictive standard for damages than the "more liberal recovery rule for *quantum meruit* claims." *Id*. at 896 n.50. Similarly, *Universal Church v. Geltzer*, 463 F. 3d 218, 226-27 (2d Cir. 2006) (appeal in bankruptcy case involving alleged fraudulent transfers), is inapposite because in that case the appellate court simply reversed summary judgment and remanded the case for further proceedings, since neither the court nor the parties had given any attention to fluctuations in the debtor's various expenses when determining the question of insolvency and "net worth" under the "balance sheet test" at the time of the challenged transfers. Here, by contrast, Mayer was not deprived of key data and CSC, which chose not to depose Mayer, simply does not like his conclusions.

Fourth, CSC mischaracterizes Mayer's report and opinions by accusing him of improperly assuming that the Subcontract Agreement would have been extended beyond the initial, five-year term. (*Id.* at 5.) Contrary to CSC's position, Mayer's $3,018,691 damages figure is based solely on the initial, five-year term. Mayer also calculates the lost-profits damages that would be associated with each year of the contract extension period, but he does not opine on whether such damages should be recovered. Such determination is for the jury to make.

Finally, CSC argues that Mayer "speculates" about whether CSC's breach caused the alleged harm. (*Id.* at 6.) That is no true. There is no dispute about the fact that CSC terminated SDI, thereby depriving SDI revenues that it otherwise would have obtained. Mayer determined that the lost revenues under the Subcontract Agreement (when appropriately discounted by incremental expenses avoided and for the time-value-of-money) would result in lost-profits of more than $3 million, even without considering "add-on services" or the three-year extension period. Mayer's opinion is not based upon speculation, as CSC contends, but instead on a careful analysis and the admitted fact that SDI was deprived of revenues. *Hallmark Ins. Admins., Inc. v. Colonial Penn Life Ins. Co.*, 990 F.2d 984, 989 (7th Cir. 1993) (applying Pennsylvania law); *see also Wash Solutions, Inc. v. PDQ Mfg., Inc.*, 395 F.3d 888, 893-95 (8th Cir. 2005).

Ultimately, aside from being inaccurate, CSC's accusations concern the factual basis of Mayer's opinion and do not justify the exclusion of his testimony. *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, No. 08 C 242, 2010 WL 3397358, at *6 (N.D. Ill. Aug. 24, 2010) (St. Eve, J.); *see also JamSports & Entm't, LLC v. Paradama Prods., Inc.*, 336 F. Supp. 2d 824, 841 (N.D. Ill. 2004) ("[Defendant's] potshots do not raise a serious challenge to [the expert's] methodology . . .

. Cross-examination, not exclusion, is the appropriate vehicle for advancing the sort of incredulity that [Defendant] urges.").

### III. Mayer's Opinions Regarding the Two, Alternative Bases of a *Quantum Meruit* Recovery Are Consistent with Illinois Law.

CSC claims that Mayer uses an "incorrect methodology" to assess the two, alternative bases for a *quantum meruit* recovery – *i.e.*, SDI's economic costs and CSC's economic enrichment. (CSC Br. at 4.) That argument is without merit for several reasons.

The term *quantum meruit* means "as much as he deserves," and is used in the law to describe a fair, just, and equitable recovery from one who has been enriched by the claimant. *Edens View Realty & Inv., Inc. v. Heritage Enters., Inc.*, 408 N.E.2d 1069, 1075, 87 Ill. App. 3d 480, 486 (Ill. App. Ct. 1980). Under Illinois law, a proper recovery in *quantum meruit* may be measured either by "the economic cost to plaintiff of providing a benefit or the economic enrichment of defendant in receiving it." *Midcoast Aviation, Inc. v. Gen. Elec. Credit Corp.*, 907 F.2d 732, 745 (7th Cir. 1990). A plaintiff is entitled to recover any amount that is just. *Id.*; *see also Edens View*, 408 N.E.2d at 1074, 87 Ill. App. 3d at 486.

The question of what amount of recovery is just under the circumstances is a question of fact, and is not always determined based upon a rigid, mechanical process such as hours times hourly rate. *Edens View*, 408 N.E.2d at 1072, 1074-75, 87 Ill. App. 3d at 483, 486-87 (affirming *quantum meruit* award based on a percentage commission, rather than the brief time spent by the plaintiff in providing services); *see also Overseas Dev. Disc Corp. v. Sangamo Constr. Co., Inc.*, 840 F.2d 1319, 1326-29 (7th Cir. 1987) (applying *quantum meruit* under Kuwait law, but extensively citing to Illinois law and other "traditional common law [of] *quantum meruit*" and explaining that a plaintiff who assists a defendant in obtaining a business deal is "unlike a home painter, whose services are for the most part fungible and can be measured by the hours worked

10

and the paint splashed": the defendant was "buying influence and access, and that cannot be measured by the minutes expended, but rather by knowing where to spend those minutes and with whom"); *Ventura v. Titan Sports, Inc.*, 65 F.3d 725, 728-29 (8th Cir. 1995) (affirming *quantum meruit* award based on a reasonable royalty, despite the fact that the plaintiff had entered into a contract that waived royalties: "The first unique aspect of this appeal involves defining the benefit received . . . by Titan. Titan makes much of the fact that Ventura provided no services for Titan other than pursuant to the Ventura-Titan contracts. . . . In defining the `benefit' conferred . . . the proper focus is not merely Ventura's labor as he performed, but must also include the intellectual property rights created by Ventura's performance.").

Mayer's work regarding SDI's *quantum meruit* claim focuses on how to properly measure (a) "the economic cost to [SDI] of providing a benefit" to CSC, and (b) "the economic enrichment of [CSC] in receiving a benefit;" *i.e.*, the two, alternative measures set forth in the *Midcoast* case. (Mayer Rpt. at 18-19.) In respect to the costs to SDI, Mayer noted that, at CSC's request, SDI abandoned its opportunities with a CSC competitor for the Exelon business. SDI will introduce evidence at trial to show that CSC induced SDI to team up exclusively with CSC and stop all work for CSC's competitor for the Exelon business. Then, after SDI utilized its resources and personal relationships to assist CSC in successfully obtaining the Exelon business (which was valued in the hundreds of millions of dollars), CSC engaged in a bad-faith effort to renege on the parties' deal, extracted concessions from SDI until it agreed to the amounts set forth in the Subcontract Agreement, and then dropped SDI entirely in favor of another company that was willing to agree to even lower rates.

Under these circumstances, it is appropriate to consider what SDI gave up in agreeing to CSC's request for an exclusive arrangement when assessing *quantum meruit* damages. *See, e.g.*,

11

*Midcoast*, 907 F.2d at 739-740 ("GECC not only benefited from Midcoast's work, but enticed Midcoast to undertake the work in the first place," and the circumstances and the parties' expectations may be considered in evaluating an appropriate recovery in *quantum meruit*.). Consequently, Mayer provides the jury with the basis to account for the opportunity cost to SDI in providing CSC with the benefit of its service. He explains that "SDI's economic costs is its lost profits multiplied by the likelihood that . . . the competitor/SDI bid would have won" and "if the Trier of Fact determines, for example, that there is a 50% likelihood that a competitor/SDI bid would win, the measure of damages would be SDI's incremental profits of $6,105,985 (5 years) to $8,203,525 (8 years) as calculated in section 6.1.2, times 50%." (Mayer Rpt. at 19.) Mayer does not seek to usurp the role of the jury in arriving at a percentage to use for purposes of the calculation of a fair award, which would depend in large part upon the jury's view of SDI's significance to Exelon.[3] As for other elements of cost that could be included among the costs incurred by SDI in providing CSC with a benefit, such as the expenditure of goodwill by SDI and certain bid and transition work, Mayer explains that he does not add those costs because they are either too difficult to quantify, because they are separately addressed by SDI personnel, and/or to be conservative in connection with his opinions. (*Id.*)

Next, Mayer also addresses the second, alternative measure of an award in *quantum meruit – i.e.*, the benefit obtained by CSC as a result of SDI's efforts. As set forth in section 4.3 of his report, Mayer states that, as an alternative to a portion of SDI's lost incremental profits, SDI could be awarded "[a] portion of CSC's incremental profits from the Exelon Contract." The

---

[3] CSC's proffered expert, W. Davis Douglass, essentially accepts Mayer's method for measuring the costs to SDI for purposes for purposes of determining a *quantum meruit* award, but then accuses Mayer of failing to complete the task by refraining from assigning a percentage figure to use as an estimate of SDI's significance to the bid. (*See* Dkt. 167 at Ex. A ¶¶ 60-61, 64-65.) As discussed in SDI's motion to exclude his testimony, Douglass oversteps his area of expertise – and would usurp the role of the jury – by suggesting that Exelon would not have perceived SDI as important to the bid. SDI respectfully suggests that such matters are for the jury to determine.

jury could determine to award a fair portion of the "incremental profit" amounts that were calculated by Mayer, based upon the information supplied by CSC itself and by the Exelon executive who was responsible for the business, Patrick White. (*Id.* at 3, 7.)

To arrive at an appropriate incremental profit figure, Mayer first considered CSC's revenues. Because CSC failed and refused to provide the actual amount of revenues generated in connection with the Exelon Contract, Mayer used the lower range of figures that Exelon's Patrick White explained would be paid under that contract. More specifically, White testified that annual charges under the Exelon Contract would range from $30 million to $36 million per year, so to be conservative Mayer used the lower, total-revenue figure as a starting point for his calculations. (*Id.* at 7.) Next, to estimate CSC's incremental profits on those total revenues, Mayer used CSC's own, 13% profit amount, which was provided by CSC's senior pricing manager, Martin (Per) Skyman. (*Id.*) Again, Mayer's opinion is that this is a conservative approach, because Skyman also testified that CSC's actual profit target for the Exelon Contract was 15% to 18% and there is reason to believe that the 13% figure would be low to the extent that it had not been adjusted to exclude fixed costs that would have been incurred by CSC even if it had not worked on the Exelon business.[4] (*Id.* at 7-8.)

Mayer's opinion is that this alternative approach would involve a *quantum meruit* recovery comprising a "portion of" the $15,060,694 to $20,798,276 in incremental profit obtained by CSC under the Exelon Contract, based on the extent to which SDI is deemed by the trier of fact to have benefitted CSC by participating in the bid, using SDI's relationships and

---

[4] CSC falsely states that "Mayer finds a way to insure that the damage figure always comes out the same" (CSC Br. at 2). Not true. For example, Mayer's measure of damages is different for breach of the Subcontract Agreement and *quantum meruit*. Later, CSC seems to ask the Court to bar Mayer from testifying about *quantum meruit* because the Court has granted summary judgment on the breach of partnership claim. (*Id.* at 11.) But that argument makes no sense and should be rejected. Among other things, although some of the calculations of the measures of damages for alternative counts may overlap in some respects, Mayer does not "employ[] a measure of damages based on the alleged partnership agreement" in determining the costs to SDI and economic benefit to CSC.

goodwill with Exelon and Exelon's highest level executives, performing work on the transition of the Exelon business, and otherwise contributing to CSC's success. (*Id.* at 3, 18-19.) The trier of fact would determine what that fair portion should be, based upon all the evidence.

## IV.     Mayer's Testimony Will Assist the Jury.

Juries are not expected to possess the knowledge or experience required to calculate damages in cases such as this one involving lost profits, the measure of the economic costs to SDI, and/or the value of the economic enrichment of CSC. *Cf. Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 106 F.3d 1388, 1400-01 (7th Cir. 1997). Thus, Mayer's testimony will assist the jury.

CSC briefly argues that Mayer "merely parrots information provided to him by a party," but that is not true. (CSC Br. at 11-12.) Mayer performed a careful analysis of data provided by CSC, Exelon, and SDI and applied his extensive knowledge, training, and experience to calculate reasoned measures of damages in this case. Moreover, under Rule 703 of the Federal Rule of Evidence, expert witnesses are permitted to rely on such data, which other experts would rely on for the same purposes. *Minemyer*, 2009 WL 3757378, at *5-7; *Lyman*, 580 F. Supp. 2d at 724.[5]

---

[5] In addition, the fact that Mayer does not provide a final damages figure for purposes of SDI's *quantum meruit* claim does not mean that his opinions are unhelpful to the jury or inadmissible. *See, e.g.*, *Lyman*, 580 F. Supp. 2d at 724. Nor is CSC's argument supported by its citation to the easily distinguishable case of *King-Indiana Forge, Inc. v. Millennium Forge, Inc.*, No. 1:07-cv-00341-SEB-DML, 2009 WL 3187685, at *2-3 n.2 (S.D. Ind. Sept. 29, 2009), in which the purported expert, Sponsel, admitted both that he had not considered important evidence and that he had specifically rejected an "accepted methodology" in favor of an "alternative" approach: "Sponsel did not use the information provided by Ankney as the basis for his proffered opinion. . . . Instead, he simply offered Ankney's conclusions as his own. . . . Sponsel conceded that he did not take into account numerous variables that were relevant."

**V.    CSC's Claim of "Unfair Prejudice" Is Baseless, and Its Argument About "Legal Conclusions" is Both Redundant and Wrong.**

In two, short sections at the end of its brief, CSC makes two final arguments that should be rejected for reasons explained above. First, in section E, CSC briefly and vaguely accuses Mayer of testifying about "incorrect legal conclusions" and states that the "most notable of these legal conclusions is Mayer's use of the incorrect measure of damages under Illinois law with regards to measuring damages under *quantum meruit*, as well as the appropriateness of lost profit as an available measure of damages for breach of contract in this instance." (CSC Br. at 12-13.) This argument should be rejected for the reasons explained above, in sections II(B)(1) and III. CSC is simply wrong. Mayer's opinions are consistent with established law.[6]

Second, in a single sentence on the final page of its brief, CSC states in the most conclusory fashion that "given the fundamental problems and resulting unreliability with [sic] Mayer's testimony, his testimony's probative value is substantially outweighed by the danger of unfair prejudice and the risk of misleading the jury and must be excluded." (*Id.* at 13.) This half-hearted argument should be rejected. CSC has done nothing to support its claim of unfair prejudice and, as discussed above, Mayer's testimony is based on a careful, reasoned analysis that CSC is free to question him about on cross-examination. *See Hill*, 2011 WL 2461362, at *5.

## CONCLUSION

For all of the foregoing reasons, the Court should deny CSC's Motion to Exclude Expert Testimony of Michael G. Mayer.

---

[6] CSC suggests that Mayer should have used a different discount rate in accounting for the time value of money. (CSC Br. at 12 n.14.) There is no merit to CSC's argument. *See A. Kush & Assocs., Ltd. V. Weingeroff Enters., Inc.*, No. 85 C 493, 1988 WL 64082, at *4 (N.D. Ill. Jun. 8, 1988) (stating that an expert may testify as to present value calculations as of the date of trial). In any event, the correct date for this calculation is a legal issue for the Court to decide and, even if CSC were correct, the mathematical calculation is easily correctable.

Dated:  July 3, 2012	Respectfully submitted,
	SYSTEM DEVELOPMENT INTEGRATION, LLC


	By:	   s/Timothy A. Hudson   
		One of its Attorneys


Caesar A. Tabet
Timothy A. Hudson
TABET DIVITO & ROTHSTEIN LLC
The Rookery Building
209 S. LaSalle Street, 7th Floor
Chicago, IL 60604
(312) 762-9450