**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SYSTEM DEVELOPMENT INTEGRATION, LLC, | ) ) ) | |
| Plaintiff, | ) ) | No. 09-CV-4008 |
| v. | ) ) | |
| COMPUTER SCIENCES CORPORATION, | ) ) ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

Defendant Computer Sciences Corporation ("CSC") has filed a motion to exclude the expert testimony of Plaintiff System Development Integration, LLC's ("SDI") damages expert, Mr. Michael G. Mayer, pursuant Federal Rules of Evidence 702 and 403, and the Supreme Court's decision in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

For the following reasons, the Court grants the motion in part and denies it in part.

## BACKGROUND

SDI filed suit against CSC, alleging breach of a subcontract agreement, tortious interference with prospective business advantage, breach of a fiduciary duty under a partnership agreement, quantum meruit, and equitable estoppel, all arising from CSC's alleged actions in replacing SDI with another company as a minority business partner under a contract with Exelon. (R. 83, Am. Compl., *passim*.) On September 13, 2010, the Court granted CSC's motion for summary judgment with respect to all five claims and entered judgment in CSC's favor. (R.

109, Order.)  On April 1, 2011, the Court granted in part and denied in part SDI's motion to alter

or amend the judgment after determining that CSC was not entitled to summary judgment on

SDI's breach of subcontract agreement and quantum meruit claims.  (R. 116, Order.)  Those

claims remain pending, and a jury trial is scheduled for September 10, 2012.

SDI intends to offer Mr. Mayer's testimony at trial.  In his expert report, Mr. Mayer

discloses three damages opinions: (1) damages for CSC's alleged breach of the partnership

agreement; (2) damages for CSC's alleged breach of the subcontract agreement; and (3) quantum

meruit damages.  (R. 151-1, Expert Report of Michael G. Mayer, dated May 21, 2010 ("Mayer

Report").)  As explained in more detail below, CSC moves to exclude all of Mr. Mayer's

opinions in this case.  The parties did not depose Mr. Mayer, but the Court held a *Daubert*

hearing on August 6, 2012, during which time the parties had the opportunity to conduct direct

and cross examination.

## LEGAL STANDARD

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and

the Supreme Court's opinion in *Daubert*[.]"  *Lewis v. CITGO Petroleum Corp*., 561 F.3d 698,

705 (7th Cir. 2009).  "The district court functions as a gatekeeper with respect to testimony

proffered under Rule 702 to ensure that the testimony is sufficiently reliable to qualify for

admission."  *Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir. 2004) (citing *Kumho Tire Co.*

*v. Carmichael*, 526 U.S. 137, 147, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)); *see also Lapsley*

*v. Xtek, Inc*., --- F.3d ----, 2012 WL 3055865, at *6 (7th Cir. July 27, 2012) ("The purpose of [the

Daubert] inquiry is to vet the proposed testimony under Rule 702's requirements that it be

"'based on sufficient facts or data,'" use "'reliable principles and methods,'" and "'reliably

appl[y] the principles and methods to the facts of the case.'") (quoting Fed. R. Evid. 702)). Whether to admit expert testimony rests within the discretion of the district court. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997); *Lapsley*, 2012 WL 3055865, at *6 ("we 'give the district court wide latitude in performing its gate-keeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable'") (quoting *Bielskis v. Louisville Ladder, Inc*., 663 F.3d 887, 894 (7th Cir. 2011)). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard" by a preponderance of the evidence. *Lewis*, 561 F.3d at 705.

Under Rule 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also Ortiz v. City of Chicago*, 656 F.3d 523, 526 (7th Cir. 2011).

District courts employ a three-part analysis before admitting expert testimony: (1) the expert must be qualified as an expert by knowledge, skill, experience, training, or education; (2) the expert's reasoning or methodology underlying his testimony must be scientifically reliable; and (3) the expert's testimony must assist the trier of fact in understanding the evidence or to determine a factual issue. *Myers v. Illinois Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010); *see also Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811–12 (7th Cir.

3

2012). "The goal of *Daubert* is to assure that experts employ the same 'intellectual rigor' in their courtroom testimony as would be employed by an expert in the relevant field." *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007) (quoting *Kumho Tire Co.*, 526 U.S. at 152).

## ANALYSIS

### I.     Mr. Mayer is Qualified to Render Damages Opinions in This Case

Although CSC does not contend that Mr. Mayer is unqualified to testify as a damages expert in this case,[1] the Court nevertheless provides a brief summary of his qualifications. Mr. Mayer, who is a Vice President of Charles River Associates, a Chartered Financial Analyst, and a Certified Fraud Examiner, received a master's of business administration degree from the Kellogg Graduate School of Management at Northwestern University and a bachelor of science degree from Indiana University School of Business. (Mayer Report, Tab 1.) He has testified as an expert in more than 70 matters and he has served as a damages consultant to the Enron Creditors Committee. (*Id.*) In addition, he has significant experience in breach of contract litigation, and he testified that most of the litigation matters in which he testified involved an analysis of lost profit damages.

### II.     Mr. Mayer May Not Testify Regarding Partnership Agreement Damages

Mr. Mayer devotes eight pages of his twenty-page report to a discussion of the damages that SDI allegedly incurred as a result of CSC's breach of fiduciary duty under an alleged partnership agreement. (Mayer Report at 6-13.) On September 13, 2010, the Court granted

---

[1] Although CSC asserts that Mr. Mayer's approach is "that of an advocate, not an expert qualified in a relevant subject matter . . . ," (R. 151,  CSC's Mem. in Supp. of Mot. to Exclude Mayer at 1), CSC does not substantively dispute that Mr. Mayer is qualified to render damages opinions in this case.

summary judgment in favor of CSC on SDI's breach of fiduciary duty claim, determining that the parties never entered into a partnership agreement. (R. 109, Order.) The parties agree that Mr. Mayer's opinions regarding damages arising from CSC's alleged breach of fiduciary duty under the partnership agreement are irrelevant because the Court has dismissed that claim. (R. 151, CSC's Mem. in Supp. of Mot. to Exclude Mayer ("Mem.") at 11; R. 173, SDI's Opp. to Mot. to Exclude Mayer ("Opp.") at 1-2; R. 167, SDI's Mot. to Exclude Douglass at 2 n.2.); s*ee also* Fed. R. Evid. 401 ("Evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would b without the evidence; and (b) the fact is of consequence in determining the action.").[2] The Court accordingly grants this aspect of CSC's motion without objection.

### III. Quantum Meruit Opinions

Mr. Mayer proffers two different quantum meruit damages opinions. First, he opines on what he terms "SDI's economic cost of providing benefits to CSC." (Mayer Report at 18.) Next, he offers an opinion on the "economic enrichment of CSC in receiving SDI's services." (*Id.* at 19.) CSC argues that Mr. Mayer's quantum meruit opinions are inadmissible because they do not comport with the measure of recovery for quantum meruit claims under Illinois law and because they are speculative and unreliable. For the reasons explained below, the Court excludes Mr. Mayer's quantum meruit damage opinions.

---

[2] SDI argues that certain portions of Mr. Mayer's opinions regarding SDI's breach of fiduciary duty claim are relevant to Mr. Mayer's quantum meruit damages opinions. (SDI's Opp. at 12-13.) For the reasons set forth below, however, the Court excludes Mr. Mayer's quantum meruit damages opinions. Therefore, SDI's argument is moot.

5

### A.      Measure of Recovery for Quantum Meruit Claims Under Illinois Law

As the Court has previously explained, the "correct measure for quantum meruit recovery is the amount which the court considers defendant has been unjustly enriched at the expense of plaintiff," which is "generally the lower of these two: the economic cost to plaintiff of providing a benefit or the economic enrichment of defendant in receiving it." (R. 210, Aug. 3, 2012 Order at 15 (citing *Midcoast Aviation, Inc. v. Gen. Elec. Credit Corp.*, 907 F.2d 732, 745 (7th Cir. 1990) (citations and internal quotation marks omitted).)

### B.      Economic Cost

Mr. Mayer opines that SDI incurred economic costs in providing services to CSC in three ways. First, he states that SDI, at CSC's request, incurred cost in giving up the opportunity to partner with CSC's competitors. (Mayer Report at 18.) Second, he opines that SDI "used its relationships and goodwill to promote the CSC/SDI bid." (*Id.*) Third, he states that SDI "conducted bid and transition related work," including "recruiting 29 IT specialists for the contract, hosting CSC employees in its office space, and [conducting] transition related work such as field surveys of Exelon project sites." (*Id.* at 18-19.) He then opines that "SDI's economic cost is its lost profits multiplied by the likelihood that, as a result of bringing the contributions it made to the CSC/SDI bid to a competitor/SDI bid, the competitor/SDI bid would have won." (*Id.* at 19.) He states, as an example, that if the trier of fact "determines . . . that there is a 50% likelihood that a competitor/SDI bid would win, the measure of damages would

be SDI's incremental profits of $6,105,985 (5 years) to $8,203,525 (8 years) as calculated in section 6.1.2,[3] times 50%." (*Id.*)

As to the first part of Mr. Mayer's opinion, the Court has already explained in a previous order that SDI's "lost opportunity costs" in turning down opportunities to work with one of CSC's competitors is not a proper component of SDI's "economic cost" in providing services to CSC under Illinois law. (R. 210 at 15-16); *see also Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 806 (N.D. Ill. 2005) ("Expert opinions that are contrary to law are inadmissible.") (citations omitted). Accordingly, Mr. Mayer's opinion on SDI's economic cost of providing benefits to CSC is inadmissible because it focuses on SDI's cost of giving up the opportunity to partner with another competitor. In addition, Mr. Mayer's opinion in this area does not provide any authority or other reliable basis for the damages formula he applies. *See Joiner*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 418 (7th Cir. 2005) (stating that an expert must rely on "reliable principles and methods," and "relying on intuition . . . won't do") (citations omitted).

### C. Economic Enrichment

It is appropriate to consider the benefit CSC retained from SDI's services in determining the measure of recovery under quantum meruit. *See Midcoast*, 907 F.2d at 944-45. Mr. Mayer's

---

[3] Section 6.1.2 of Mayer's Report contains his opinions regarding SDI's lost incremental profits for its claim for breach of fiduciary duty under the partnership agreement. (Mayer Report at 8-13.)

opinion regarding the economic enrichment that CSC received from SDI's services consists

entirely of three sentences at the end of his report:

> CSC was the economic beneficiary of SDI's help with the bid and
> the transition work.  To the extent that CSC would not have won
> the Exelon Contract without SDI's role in the bid, it was enriched
> by the incremental profits it receives as a result of having the
> Exelon Contract.  This figure was calculated to be $15,060,694
> (5 years) to $20,798,276 (8 years) in section 6.1.1[4] above.

(Mayer Report 19.)

Mr. Mayer, however, provides no analysis, or citation to any reliable basis, in support of

his opinion that, in the event the jury determines that CSC would not have won the Exelon

Contract without SDI's services, SDI's damages include *all of* CSC's incremental profits under

the Exelon contract.[5]  Mr. Mayer's unsupported, "bottom line" conclusion is insufficient to meet

Rule 702's standard for admissibility of expert testimony.  *See Joiner*, 522 U.S. at 146 ("A court

may conclude that there is simply too great an analytical gap between the data and the opinion

proffered."); *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010) ("To be admissible under

Federal Rule of Evidence 702, the expert's opinion must offer more than a 'bottom line.'")

(citing *Wendler & Ezra, P.C. v. Am. Int'l Grp., Inc.*, 521 F.3d 790, 791 (7th Cir. 2008) (per

curiam)).  Although he refers to his breach of fiduciary duty damages calculations, Mr. Mayer

---

[4]  Section 6.1.1 of Mr. Mayer's report contains his opinions regarding CSC's incremental profits from the Exelon Contract.  (Mayer Report at 6-8.)

[5]  Indeed, SDI attempts to recharacterize Mr. Mayer's opinion in its response brief, wherein it contends that Mr. Mayer opines that SDI's quantum meruit damages based on CSC's economic benefit is "[a] portion of CSC's incremental profits from the Exelon Contract."  (SDI's Opp. at 12 (citing Mayer Report at 3).)  That, however, is inconsistent with Mr. Mayer's opinion that SDI's damages consist of *all of* CSC's incremental profits from the CSC contract.  (Mayer Report at 19.)

does not articulate any reliable principle or reasoning to support his conclusion that it is proper to attribute *all of* the benefit CSC has received from its contract with Exelon (i.e., CSC's incremental profits) to SDI's pre-contract services.[6]  *See Bielskis*, 663 F.3d at 894 (holding that the district court did not abuse its discretion in excluding expert testimony that "sounded more like the sort of '[t]alking off the cuff' – without data or analysis – that [the Seventh Circuit has] repeatedly characterized as insufficient") (citation omitted).  Without a reliable basis, Mr. Mayer's opinion is too speculative to be admissible.  *See, e.g., Loeffel Steel*, 387 F. Supp. 2d at 815 n.17 ("Even where a witness is an expert in the relevant field, the evidentiary reliability demanded by *Daubert* is not present when his or her opinion is speculative or rests on an unsound basis.").

## IV.    Subcontract Agreement

### A.    Mr. Mayer's Opinions and CSC's Challenges to Those Opinions

Mr. Mayer opines that SDI's damages for breach of the subcontract agreement are its lost incremental profits.  He uses a "standard" lost profits methodology to determine SDI's damages: "the present value of [SDI's] lost revenues under the Subcontract Agreement minus the incremental expenses that would have been required for SDI to realize such revenues."  (Mayer

---

[6] Even if Mr. Mayer's economic benefit opinion was admissible, it likely would not have a dispositive impact on SDI's recoverable damages.  As the Seventh Circuit teaches, the purpose of quantum meruit recovery is not necessarily to require the defendant to disgorge all enrichment he has received, but rather to "make[] the defendant's enrichment 'just.'"  *Midcoast*, 907 F.2d at 745.  Notably, "[t]he defendant's enrichment would be just if the plaintiff received the full value of his work" because "[a]t that point, the plaintiff would have no unjustness to complain about, even if the defendant remains somewhat enriched."  *Id.*  As such, SDI's damages for quantum meruit are the lower of its economic cost in providing the services and CSC's economic benefit in receiving it.  *Id.*  Based on the information in the record, SDI's cost of providing services was significantly less than $15 million.

Report at 3, 14.)  Accordingly, his opinion consists of three sub-parts: (1) SDI's lost revenues under the subcontract agreement; (2) SDI's incremental expenses related to the subcontract agreement; and (3) present value discount rate.  (*Id.* at 14.)

First, Mr. Mayer opines on the amount of SDI's base revenues for years one through eight of the subcontract agreement.[7]  (*Id.*)  For years one through five, Mr. Mayer uses the volume and rate figures provided in the subcontract agreement to determine SDI's base revenues.[8]  (*Id.*, Ex. 5.1.4; Def's Hearing Ex. 1.)  To determine this amount for each year, he multiplies the "annual baseline volume" by the "SDI rates" for various services that SDI was to provide pursuant to the subcontract agreement.[9]  To determine the "annual baseline volume," he multiplies the "monthly baseline volume" provided in the contract by twelve.  (*Id.*, Exs. 5.1.2 & 5.1.3.)  Because the subcontract agreement does not provide the volume and rate information for years six through eight, Mr. Mayer "assumed that the growth rate for the revenues associated with these services would grow at the same rate as the revenues listed in the Exelon Contract." (*Id.* at 14 & Ex. 5.1.5.)  During the hearing, he clarified that he used the growth rate implied in

---

[7]  Mr. Mayer's opinion includes base revenue only, and does not include calculations for add-on projects.  (Mayer Report at 3 n.1.)

[8]  The parties dispute whether a subcontract agreement exists and the duration of any such agreement.  Mr. Mayer has presumed liability for purposes of his opinions.  The Court's reference herein to the subcontract agreement is not an indication of the Court's views on whether a valid subcontract agreement exists.

[9]  Mr. Mayer lists these services on page 15 and in Exhibit 5.1.1 of his report.  They are as follows: End User Systems located at Critical Sites, End User Systems located at Standard Sites, End User Systems receiving Executive Service, Mobility Devices, Critical Site Desktop IMAC, Standard Site Desktop IMAC, Project Desktop Refresh, and Individual Desktop Refresh. (Mayer Report at 15 & Ex. 5.1.1.)

CSC's revenue projections under the Exelon contract for years six through eight to determine what SDI would have charged CSC for its services during those years.

Second, Mr. Mayer opines on SDI's incremental expenses related to the subcontract agreement. He defines incremental expenses as those "that SDI would have incurred in order to provide the services to Exelon as outlined in the Subcontract Agreement between SDI and CSC." (*Id.* at 14.) Specifically, he opines that SDI's incremental expenses include

> (1) The salaries and benefits of the staff hired by SDI to perform the services for Exelon;

> (2) Other expenses related to the SDI staff that were to perform services for Exelon such as the cost of laptops, cell phones, training, and mileage; and

> (3) Overhead expenses that would increase such as recruiting costs, payroll services, worker's compensation insurance, and working capital requirements.

(*Id.* at 15 & Exs. 5.2, 5.3, 5.4.) Mr. Mayer derived SDI's expense figures from, among other sources, discussions with SDI personnel, SDI's financial statements, invoices, and expense figures from SDI's past projects.

Mr. Mayer also proffers an opinion on the present value discount. Mr. Mayer determines SDI's lost profits as of the anticipated date of trial, which, at the time Mr. Mayer issued his report, was October 2010.[10] To do so, he applies a discount rate of 14.51%. (*Id.* at 16.) Combining all of the above factors, Mr. Mayer concludes that the present value of SDI's lost profits is the following:

---

[10] Trial was initially scheduled for November 18, 2011. At CSC's request, the Court continued the trial date. (R. 135.)

| Contract Term | Present Value of Lost Profits |
|---|---|
| 5 years | $3,018,691 |
| 6 years | $3,310,000 |
| 7 years | $3,565,283 |
| 8 years | $3,762,597 |

(*Id.*)

Additionally, Mr. Mayer cross-checks his opinions by performing a "reasonableness test," pursuant to which he compared his lost profits conclusions to three of SDI's other projects, which SDI asserts involve "similar, long-term computer-support services." (SDI's Opp. at 5.)

CSC argues that Mr. Mayer's breach of subcontract opinions are inadmissible for several reasons. First, it contends that Mr. Mayer relies on "unsupported and unfounded assumptions," including: (1) SDI was the sole reason that Exelon awarded the contract to CSC; (2) the Exelon contract would be extended past the initial five-year term; (3) SDI would have performed desktop services at a consistent level during the initial five year term and any extensions; (4) CSC's actions caused SDI's alleged harm; and (5) the profits under the Exelon contract, and SDI's entitlement to those profits. (SDI's Mot. at 6.) As a result, CSC submits, Mr. Mayer's opinions will not assist the trier of fact. (*Id.* at 11.) Second, CSC argues that Mr. Mayer's opinions must be excluded under the "new business rule." (*Id.* at 9-10.) Third, CSC challenges Mr. Mayer's present value discount analysis, arguing that he failed to provide any support for his analysis and that he used the incorrect date for determining SDI's damages. (*Id.* at 12, n.14.) Finally, CSC asserts a blanket challenge to Mr. Mayer's proffered "legal conclusions" and also asserts that the "fundamental problems and resulting unreliability" of Mr. Mayer's report render it inadmissible under Rule 403. (*Id.* at 12-13.) The Court addresses each objection in turn.

## B.     Mr. Mayer's Factual Assumptions

An expert's testimony must rest on "sufficient facts or data." *Bielskis*, 663 F.3d at 895. The Court must be mindful, however, not to usurp the jury's role of determining the "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis." *Id.* at 896 (citing *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2011)); *see also LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, No. 08 C 242, 2010 WL 3397358, at *6 (N.D. Ill. Aug. 24, 2010) ("'The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact . . . .'") (quoting *Smith*, 215 F.3d at 718).

CSC's argument that Mr. Mayer inappropriately assumed the existence of an enforceable contract and that CSC's breach was the sole cause of SDI's damages is unpersuasive. (CSC's Mem. at 5 n.3; CSC's Reply at 2.)  It is entirely appropriate for a damages expert to assume liability for the purposes of his or her opinion.  To hold otherwise would be illogical.  *See, e.g., In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 646, 660 (N.D. Ill. 2006) ("A damages model would, of course, be necessarily consistent with liability, or necessarily assume liability.") (citing cases); *accord Platypus Wear, Inc. v. Clarke Modet & Co., Inc.* No. 06-20976-CIV, 2008 WL 4533914, at *6 (S.D. Fla. Oct. 7, 2008) ("Ultimately, every expert witness who calculates damages sustained from a breach of a given contract must assume the contract's enforceability under the law.  An accountant or forensic expert would not be expected or allowed to render an underlying legal opinion on that issue.").  Mr. Mayer may not offer legal conclusions that a subcontract exists or that CSC breached the subcontract.  Indeed, Mr. Mayer testified during the

*Daubert* hearing that he was not offering an opinion as to the existence of a subcontract or whether CSC breached any such contract.

CSC's argument that the Court should exclude Mr. Mayer's opinion because it impermissibly assumes that "the Exelon Contract would be extended past the initial five (5) year term" and that SDI "would have performed [desktop side] services (at a consistent level) for the initial five (5) year term, as well as any extensions" also fails. (CSC's Mem. at 6.) As an initial matter, Mr. Mayer's report does not assume or suggest that the Exelon Contract would have been extended past the initial five-year term. At the hearing, Mr. Mayer testified that he is not offering an opinion as to whether CSC would have extended the subcontract. Rather, Mr. Mayer provides damages calculations based on the initial five-year term, and also provides damages calculations in the event the jury determines, based on the evidence presented at trial, that Exelon and CSC would have extended the contract for an additional one, two, or three years. The strength or weakness of the factual underpinnings of Mr. Mayer's testimony is "a matter not for exclusion," but "for '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof . . . .'" *LG Elecs.*, 2010 WL 3397358, at *6 (quoting *Daubert*, 509 U.S. at 596); *see also Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 762 (7th Cir. 2010) ("[d]etermination on admissibility [of expert testimony] should not supplant the adversarial process; shaky expert testimony may be admissible, assailable by its opponents through cross-examination") (quoting *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010)); *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 586-87 (7th Cir. 2000) ("the factual underpinnings of expert testimony may be subject to counter-attack").

14

CSC's argument that Mr. Mayer's lost profits opinions are not based on a reasonable factual basis fares no better. When a party seeks damages in the form of lost profits under Illinois law, that party has "the burden of presenting to the jury sufficient evidence on which to determine the amount of its lost profits to a reasonable degree of certainty." *Smart Mktg. Grp. v. Publ'ns, Int'l Ltd.*, 624 F.3d 824, 829 (7th Cir. 2010) (citing *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 384 Ill. App. 3d 849, 323 Ill. Dec. 507, 893 N.E.2d 981, 994 (2008)). If it cannot do so, "only nominal damages are recoverable at the discretion of the trial judge." *TAS Distrib. Co. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 632 (7th Cir. 2007). Damages for lost profits are "inherently uncertain and incapable of calculation with mathematical precision" due to their prospective nature, but a claimant must nevertheless present evidence that "afford[s] a reasonable basis for the computation of damages." *Id.* at 632-33; *see also Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 248, 305 Ill. Dec. 584, 856 N.E.2d 389 (2006) ("A recovery may be had for prospective profits when there are any criteria by which the probable profits can be estimated with reasonable certainty."). As the Illinois Supreme Court teaches,

> The law requires only that the plaintiff approximate the claimed lost profits by competent evidence. Such evidence must with a fair degree of probability tend to establish a basis for the assessment of damages for lost profits.

*Tri-G*, 222 Ill. 2d at 248 (citation omitted). Recovery of lost profits damages cannot, however, "be based on conjecture or sheer speculation." *Id.* (citation omitted); *see also Smart Mktg.*, 624 F.3d at 829 ("While courts do not ask for mathematical precision, they demand more than conjecture or speculation to support the jury's award.") (citing *In re Estate of Talty*, 376 Ill. App. 3d 1082, 315 Ill. Dec. 866, 877 N.E.2d 1195, 1207 (Ill. App. Ct. 2007)); *F:A J Kikson v.*

*Underwriters Labs., Inc.*, 492 F.3d 794, 802 (7th Cir. 2007) ("lost profits cannot represent

'hopes rather than the results of scientific analysis.'") (quoting *Zenith*, 395 F.3d at 420).

Mr. Mayer's lost profits opinions are based on reliable assumptions and are admissible

under Rule 702. Specifically, Mr. Mayer bases his lost profits calculations on the volume and

rate information provided in the subcontract agreement. As Mr. Mayer testified during the

hearing, those figures reflect the parties' "best understanding" as to the volume of services SDI

was to provide under the subcontract as well as the agreed-upon rates, assuming that a

subcontract exists. CSC's many challenges to the veracity of those assumptions is a matter for

"vigorous cross-examination, presentation of contrary evidence, and careful instruction on the

burden of proof," not for exclusion. *See Daubert*, 509 U.S. at 596; *see also Lapsley*, 2012 WL

3055865, at *1 ("A *Daubert* inquiry is not designed to have the district judge take the place of

the jury to decide ultimate issues of credibility and accuracy.").

CSC argues that the Seventh Circuit and courts in this District have held that an expert's

factual assumptions based on a party's untested internal projections lack reliability under Rule

702. *See, e.g.*, *Zenith*, 395 F.3d at 420; *see also Victory Records*, 2011 WL 382743, at *2-3

(excluding expert opinion under *Daubert* where expert based lost profits opinion on the

sponsoring party's internal projections without independently determining the validity of the

internal projections). Here, however, Mr. Mayer does not simply rely on SDI's own, untested

internal projections. Rather, he relies on the specific figures in the subcontract, and he credibly

explained during the hearing why he relied on those figures. Specifically, he testified that

although he did not view the figures as "a guarantee," he "viewed [them] as the parties' best

expectation of what the volumes and applicable rates would be, which is the best estimate of

revenue that [he] could derive." Under the facts of this case, the figures in the subcontract provide "criteria by which the probable profits can be estimated with reasonable certainty." *Tri-G*, 222 Ill. 2d at 248; *see also LG Elecs*, 2010 WL 3397358, at *6-7 (allowing expert to testify regarding lost profits where the expert "explained at length the reasons for his reliance on [the defendant's] internal forecasts and his methodology in applying figures derived from those forecasts to actual sales"). CSC is free to cross-examine Mr. Mayer regarding his factual assumptions at trial.

Likewise, Mr. Mayer's reliance on factual assumptions regarding SDI's expenses does not render his opinions inadmissible. Mr. Mayer testified credibly that he and his team derived these figures from conversations with SDI personnel, SDI's financial statements, and invoices. Notably, Mr. Mayer testified that the approach he used – called the "account analysis approach" – is a method that other professionals in his field use and rely on to analyze a company's incremental expenses associated with a contract. CSC did not challenge this testimony. Again, CSC is free to challenge these factual assumptions through cross-examination and the introduction of contrary evidence at trial.

Finally, Mr. Mayer also performed a "reasonableness test," wherein he compared SDI's operating profit margin in this case with SDI's operating profit margin in comparable past projects for different customers. Notably, SDI's operating profit margin under Mr. Mayer's damages opinion is near the lower range of SDI's operating profit margin for SDI's past projects.

### C. New Business Rule

"The general rule under Illinois law is that a new business has no right to recover lost profits" because such profits are "too uncertain, specific and remote to permit recovery." *TAS*

17

*Distrib.*, 491 F.3d at 633-34. The rule seeks "to limit the speculative element in estimating lost profits." *BEM I, L.L.C. v. Anthropologie Inc.*, 301 F.3d 548, 555 (7th Cir. 2002); *see also Smart Mktg.*, 624 F.3d at 829.

CSC argues that the new business rule bars SDI from recovering lost profits in this case. The Court disagrees. SDI is a "previously established" business that has provided computer support services, such as the type involved in this case, repeatedly in the past. *See Tri-G*, 222 Ill.2d at 248 ("A plaintiff may satisfy the requirement of providing with a reasonable basis or with reasonable certainty damages for claimed lost profits through evidence of past profits in an established business.").[11] As such, the new business rule does not bar Mr. Mayer's damages opinions at trial.

### D. Present Value Calculation

The purpose of a present value calculation is to, in Mr. Mayer's words, "bring a series of cash flows to a particular date to take into account the time value of money." In this case, Mr. Mayer determined present value as of the anticipated trial date at the time he issued his report, which was October 2010, and he applied a present value discount factor of 14.51%. CSC argues that Mr. Mayer has not provided a sufficient explanation of his present value analysis and that he

---

[11] CSC relies on *Stuart Park Assocs. Ltd. P'ship v. Ameritech Pension Trust*, 51 F.3d 1319, 1328 (7th Cir. 1995), in support of its position, but that case is distinguishable. In *Stuart Park*, the court applied the new business rule to two real estate partnerships that were planning to develop a new complex on a barren piece of land, despite the their argument that the court should consider their successes with other apartment buildings as probative evidence of the profits the venture at issue in the dispute would have returned. *Id.* The court explained that "these are different pieces of real estate from different markets–not providing a self-evident basis for generalization." *Id.* Based on the information in the record, SDI's previous experience providing computer support services to customers is not in a "different market" and does not involve significantly different services.

should have used the date of breach (November 1, 2008),[12] rather than the date of trial, to determine the present value of SDI's alleged damages.

To illustrate how Mr. Mayer's present value calculation affects his ultimate damages opinion, the Court reproduces a portion of Exhibit 5.0 to his report below:

|  | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| **SDI Revenue** | $3,056,373 | $2,878,532 | $2,768,951 | $2,654,150 | $2,547,848 |
| **SDI Subcontract Profit** | $673,444 | $731,721 | $628,774 | $572,913 | $535,913 |
| **Present Value Factor** | 1.2185 | 1.0641 | 0.9292 | 0.8106 | 0.7087 |
| **Present Value of SDI Profit** | $820,592 | $778,624 | $584,257 | $464,403 | $370,815 |

As is apparent from Mr. Mayer's calculations, application of the present value factor analysis to the first two years results in a present value lost profits amount that is higher than the lost profits amount derived from Mr. Mayer's initial calculation of SDI's profit (*i.e.*, "SDI Subcontract Profit"). On the other hand, the present value amounts for years three through five are lower than Mr. Mayer's initial calculation of SDI's lost profits.

---

[12] SDI alleges that CSC notified it on September 26, 2008 that CSC had terminated the subcontract agreement. (First Am. Compl. ¶ 62.) CSC, however, asserts that "SDI consistently has maintained that November 1, 2008 is when the breach or injury occurred." (R. 202, CSC's Brief in Support of the Proper Date for Determining Damages at 4.)

Mr. Mayer testified during his hearing that he derived the 14.51% present discount factor from the 2009 Ibbotson Cost of Capital Yearbook ("Ibbotson"). He further stated that Ibbotson is a "standard reference" for analysts who provide valuation services. CSC did not challenge his testimony regarding Ibbotson. Based on this information, a reliable basis for Mr. Mayer's present value calculation exists.

Mr. Mayer, however, used the incorrect date from which to determine the present value of SDI's damages. Relying on *In re Air Crash Disaster Near Chicago*, 644 F.2d 633 (7th Cir. 1981), SDI asserts that the proper date for determining damages is the date of trial. *Air Crash*, however, involved a cause of action under the Illinois Wrongful Death Act, not a breach of contract claim. The Seventh Circuit found that the Illinois Wrongful Death Act "required the loss to be calculated not as of the date of death, but as of the date of trial." *Euroholdings Capital*, 602 F. Supp. 2d 928, 942 (N.D. Ill. 2009) (distinguishing *Air Crash*); *see also Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 270 (7th Cir. 1986) (stating that in *Air Crash*, "[t]he statute required 'fair and just compensation' and this was interpreted as requiring damages that would compensate for the present value of plaintiff's pecuniary loss as of the date of trial"). In contrast, the proper date for determining damages in a breach of contract action is the date of the breach, not the date of trial. *See Kagan v. Edison Bros. Stores, Inc.*, 907 F.2d 690, 692 (7th Cir. 1990) ("Damages are measured as of the date of breach, not as of some later time."); 25 C.J.S. Damages § 123 ("The general rule is that damages, in an action for breach of contract, are to be measured as of the date of the breach, and the damages for an anticipatory breach are to be ascertained as of the date of the breach."). *But see Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, No. 94 C 50392, 1998 WL 299300, at *2 (N.D. Ill. June 3, 1998) ("The question of

whether present cash value is measured from the point of injury or the time of trial (and it is

clearly determined at the time of trial . . . ) is a legal question which a court, not a damages

expert, must decide.") (relying on *Air Crash*, 644 F.2d at 633).

Allowing SDI to recover the present value of its damages as of the date of trial would run

afoul of the well-established law in Illinois that in actions at law, "prejudgment interest is

recoverable only where authorized by agreement of the parties or by statute." *Kouzoukas v.

Retirement Bd. of Policemen's Annuity & Benefit Fund of the City of Chi*., 234 Ill. 2d 446, 474,

334 Ill. Dec. 924, 917 N.E.2d 999 (2009) (citing *Tri-G*, 222 Ill. 2d at 255, 257). SDI has not

argued that any statute or agreement entitles it to prejudgment interest in this case.

As is apparent from reviewing Mr. Mayer's present value calculations as applied to SDI's

lost profits in the table above, using the trial date to determine present value calculations results

in SDI recovering more damages for the years that have passed between the date of the breach

and the present than it could have recovered as of the date of the breach. Although labeled a

"present value calculation," this is, in effect, merely a different way of accounting for

prejudgment interest, which is not recoverable in this case.[13] Other courts in this District have

disallowed evidence of prejudgment interest in similar circumstances. *See e.g., Euroholdings

Capital Inv. Corp. v. Harris Trust & Savings Bank, S.A.*, 602 F. Supp. 2d 928, 941-42 (N.D. Ill.

2009); *Monetti v. Anchor Hocking Corp*., No. 87 C 9594, 1992 WL 67852, at *3 (N.D. Ill. Mar.

23, 1992) (rejecting the plaintiff's argument that it could recover the present value of past lost

---

[13] Notably, in *Air Crash*, the Seventh Circuit explained that "if the correct measure of damages in a wrongful death case were the present value at date of death rather than trial, any amount more than present value at date of death would have to be considered interest, rather than compensation, and therefore should not be allowed." 644 F.2d at 640.

profits as of the date of trial, stating that "[a]s it relates to damages for past losses, the court cannot discern a difference between [the plaintiff's] claim for present value and a claim for prejudgment interest").

Indeed, the Illinois Supreme Court has explained that, in an action at law, a plaintiff is not entitled to prejudgment interest, "notwithstanding that an injured party who is eventually compensated may suffer detriment from the inability to use the money from the date of loss to the date of compensation." *Tri-G*, 222 Ill. 2d at 258 (citing *Cont'l Casualty Co. v. Commonwealth Edison Co.*, 286 Ill. App. 3d 572, 579, 221 Ill. Dec. 807, 676 N.E.2d 328 (Ill. App. Ct. 1997)). It is therefore improper to use the trial date as the date for determining SDI's lost profits damages.

Both parties agree that the appropriate date for determining damages is an issue of law for the Court and not a fact issue for expert testimony. (R. 200, SDI's Brief Regarding Proper Date for Damages Calculations at 1, 5; R. 202, CSC's Brief in Support of Proper Date for Determining Damages at 4-5.) Indeed, Mr. Mayer testified during the hearing that he could "easily" recalculate SDI's lost profits damages based on a new date should the Court determine that the date he used is incorrect. As such, Mr. Mayer's use of the incorrect date does not require the Court to exclude his opinion, especially because Mr. Mayer has provided a reliable basis and methodology for his present value analysis. If SDI intends to offer Mr. Mayer's present value calculations at trial, Mr. Mayer must update his calculations in accordance with this Order. SDI must tender a copy of Mr. Mayer's revised calculations and damages figures to CSC no later than Monday, August 27, 2012.

### E.    Legal Conclusions

Although CSC contends that Mr. Mayer's report is "replete with improper ultimate legal conclusions," CSC identifies only two examples: (1) Mr. Mayer's "use of the incorrect measure of damages under Illinois law with regard to measuring damages under quantum meruit" and (2) "the appropriateness of lost profit [sic] as an available measure of damages for breach of contract in this instance."  (CSC's Mem. at 13.)  CSC's first concern is moot given the Court's exclusion of Mr. Mayer's quantum meruit opinions, as explained above.  With respect to CSC's second argument, Mr. Mayer will not be allowed at trial to opine on what he believes is the legal standard regarding the proper measure of recovery, or any other legal issue.  Given Mr. Mayer's credible testimony during the hearing that he is not offering opinions regarding legal conclusions, however, the Court does not expect that CSC's concern will be an issue at trial. CSC, of course, is free to make appropriate objections to Mr. Mayer's testimony during the trial.

### F.    Rule 403

CSC's final argument for excluding Mr. Mayer's testimony is that its probative value is substantially outweighed by the danger of unfair prejudice and the risk of misleading the jury. (CSC's Mem. at 13.)  Because CSC's entire argument in this regard consists of one conclusory sentence, it has waived this argument.  *See United States v. Collins*, 604 F.3d 481, 487 n.2 (7th Cir. 2010) ("In passing, Collins' brief makes a perfunctory mention of the need for Rule 403 analysis of this evidence, but he did not develop that argument.  As we have said numerous times, undeveloped arguments are deemed waived[.]"); *Long v. Teachers' Retirement Sys. of Ill.*, 585 F.3d 344, 349 (7th Cir. 2009) ("'[U]nsupported and underdeveloped arguments are waived.'") (quoting *United States v. Turcotte*, 405 F.3d 515 (7th Cir. 2005)).

## CONCLUSION

For the reasons explained above, the Court grants in part and denies in part CSC's

motion.

**DATED:  August 9, 2012**                    **ENTERED:**

**AMY J. ST. EVE**
**United States District Court Judge**